Jane W. NESSELRODE, et al.,
Respondents,

v.

EXECUTIVE BEECHCRAFT, INC. and Beech Aircraft Corp., Appellants,

and

Judith Lynn Hultgren,
Defendant Ad Litem.

No. 67428.

Supreme Court of Missouri,
En Banc.

March 25, 1986.

Rehearing Denied April 15, 1986.

983 (1983). In so doing we intimate no view as to their ultimate disposition.

7. *See supra* note 6.

Reed O. Gentry, Douglas N. Ghertner, Kansas City, for appellant Beech Aircraft Corp.

Robert W. Cotter, Roger W. Penner, Kansas City, for appellant Executive Beechcraft, Inc.

Glenn E. McCann, James Welsh, Theresa Shean Hall, Kansas City, James T. Wiglesworth, Gregory M. Dennis, Overland Park, Kan., William E. Simmons, Kansas City, for respondents.

BILLINGS, Judge.

This appeal by defendants Beech Aircraft Corporation (Beech) and Executive Beechcraft, Inc. (Executive) involves the law of strict tort liability. Suit was brought as a products liability action under Missouri's wrongful death statute, § 537.-080(1), RSMo Supp.1981 (1978 statute revised in 1979). Judgment was entered on the jury's verdict in favor of Jane Nesselrode, wife of decedent, George Nesselrode,

and his three daughters by a prior marriage. We affirm the judgment.

On July 23, 1981, George Nesselrode and two business associates boarded a chartered Beech Baron Model 58TC airplane at Kansas City, Missouri's Downtown Airport. The twin-engine airplane was owned, operated and maintained by Executive. Within three minutes after taking off, the airplane crashed, killing the pilot, Gerald Hultgren, and his three passengers.

Jane Nesselrode filed a six count wrongful death petition against Beech, Executive and the estate of Gerald Hultgren. The three adult children of Nesselrode intervened as plaintiffs and filed their petition which mirrored the petition of the widow.

Plaintiffs' petitions advanced two primary theories of liability against Beech and Executive. First, plaintiffs alleged that Beech had negligently designed and manufactured two important flight components—the right and left elevator trim tab actuators. These two parts are critical in controlling the upward and downward movement of the airplane. In addition to alleging negligent design, plaintiffs alleged that Beech's negligence included its failure to provide a warning adequate to safeguard against the possibility of the reverse installation of the right and left elevator trim tab actuators. Plaintiffs' second theory of liability was strict tort liability for defective design and failure to warn.

As to Executive, plaintiffs advanced two theories of liability—negligent installation and inspection of the right and left elevator trim tab actuators and strict tort liability for supplying the airplane in a defective and unsafe condition. Finally, the petition stated a cause of action grounded in negligence against the pilot.

At trial, plaintiffs abandoned their allegations of negligence against Beech and Executive and the jury was instructed solely on strict tort liability in connection with the liability of Beech and Executive. It should also be noted that the trial court, with the approval of all of the parties, submitted the case under our comparative fault doctrine. However, the propriety of such an application of our comparative fault doctrine is not an issue raised by either party on this appeal and therefore is not a question for resolution in this case.

The jury returned a verdict of $1,500,-000.00 for plaintiffs against Executive and Beech. The pilot, Gerald Hultgren, was assessed 0% of fault, and accordingly, he did not appeal the judgment to the Missouri Court of Appeals, Western District. Beech and Executive, however, both sought review before the court of appeals. The court of appeals held that the trial court erred in not sustaining Beech's motion for a directed verdict and subsequent motion for a judgment notwithstanding the verdict. As to Executive, the court of appeals reversed and remanded for a new trial solely on the question of damages.

We granted transfer because of the general interest and importance of the issues raised and now decide the case as if upon original appeal. Mo. Const. art. V, § 10.

Beech's chief contention is that plaintiffs' evidence, as a matter of law, was fatally deficient and plaintiffs failed to make a submissible case under either a theory of defective design or under a theory of failure to warn.

In this appeal, Executive does not question its liability but challenges the plaintiffs' presentation of damages to the jury.

Because the focal point of this case involves the threshold question of whether Beech's elevator trim tab actuators were defective because of the way they were designed, it would seem appropriate at this juncture to briefly explain the purpose and actual operation of these two important flight control components.

In a Beech Baron Model 58TC there are two parts that are known as the right and left elevators and they are considered to be the primary flight control mechanisms for the upward and downward movement of the airplane. The elevators are located at the tail section of the airplane and are rectangular flaps inserted into the horizontal stablizer—which appears as a small set

of wings located near the rear end of the airplane.

If the pilot wants the airplane to climb upward he begins the process by pulling a control wheel, situated in front of him inside the cockpit, toward his chest. Moving the control wheel in this fashion signals the elevators—which look like flaps—to rise.

This action is designed to permit the elevators, on either side of the airplane, to use the flow of the air to push down the tail of the plane—thereby pitching the nose of the airplane upward and allowing the airplane to climb. This action by itself is sufficient to make the airplane climb; however, upon completion of this manuever, the pilot will begin to feel a tremendous force coming through the control wheel. Because of the strength of this force, the pilot must keep his hands on the wheel to prevent it from moving away from him.

Attached to each elevator is another flight control mechanism called a trim tab. The trim tabs also look like flaps and they are attached to the trailing edge of the elevators—appearing as if they were inserted into the elevators. The trim tabs are designed to help relieve the tremendous force created by the operation of the elevators. Thus, when the pilot wants to climb, he pulls the control wheel toward his chest, which causes the elevators to rise. To relieve the forces created by the movement of the elevators, he then "trims" the airplane by moving the trim tabs in a downward direction. In doing so, the trim tabs serve as a sort of deflective device in relationship to the forces created by the movement of the elevators. By working in such a manner, the trim tabs relieve the forces that are exerted on the control wheel and make the pilot's use of the control wheel much less of a physical burden.

The correct directional movement of the trim tabs is mechanically accomplished by way of two parts called actuators, or more precisely, elevator trim tab actuators. There are two actuators, a right one and a left one. In this case it is undisputed that the right actuator, which belongs on the right side of the airplane, was installed by Executive's mechanics on the left side of the airplane. And they installed the left actuator on the right side of the airplane, when it should have gone on the left side of the airplane.

Reversing the proper placement of the elevator trim tab actuators causes the trim tabs to move in a direction opposite from the one in which they are supposed to move—thereby preventing the proper operation of the elevators. Thus, when Gerald Hultgren, the pilot in this case, attempted to make the airplane climb, he began by signaling the elevators into operation. Next, he signaled the trim tabs to move downward, to assist in the climb and to relieve the forces he felt on the control wheel. But, because the right and left actuators had been reversely installed, the trim tabs not only failed to make the correct directional movements but actually forced the nose of the airplane downward, making it virtually uncontrollable.[1]

In June of 1981, a month before the fatal airplane crash, Executive performed a required 100 hour periodic inspection on this particular airplane, and during the course of the inspection discovered that the airplane's original actuators needed to be replaced.[2] Executive ordered new actuators from Beech. Approximately six days before the fatal crash, Executive's mechanics installed the new actuators, but in doing so, they installed the right actuator on the left side and the left actuator on the right side.

The crux of the plaintiffs' theory of defective design focuses on the fact that the right and left actuators, as designed by Beech, are visually identical but functional-

---

1. Immediately after takeoff the pilot radioed he was going to "have to come back in—I got trim problems." The FAA inspector, after viewing the position of the actuators, concluded the elevator trim tabs showed "almost full nose down trim."

2. Attention was initially focused on the elevator trim tabs and actuators because Beech had instructed its dealers by way of a service bulletin to check the elevator trim tabs for free play during the next 100 hour inspection.

ly distinct, and as such, they are capable of being interchanged—i.e., reversed—during installation. Relying on these facts, plaintiffs contend that the actuators, as designed, were sold in a defective and unsafe condition. In connection with their failure to warn theory of liability, plaintiffs argue essentially that the very nature of the design of the actuators created the need for a warning—and the absence of a warning detailing the possibility of reverse installation and its consequences also caused the actuators to be sold in a "defective condition".

This Court first adopted strict tort liability in *Keener v. Dayton Electric Manufacturing Company*, 445 S.W.2d 362 (Mo. 1969). In *Keener*, which was a case involving a defect in the manufacturing process rather than a problem associated with the way the product was originally designed, we set forth our basic reasons for adopting strict tort liability,[3] and we also delineated the initial contours of the doctrine. *Keener v. Dayton Electric Manufacturing Company*, 445 S.W.2d at 364-65. In the course of doing so, we acknowledged that we were adopting the rule of strict tort liability as set forth in Section 402A of the *Restatement (Second) of Torts*. *Id.* at 364.

Eight years later in *Blevins v. Cushman Motors*, 551 S.W.2d 602 (Mo. banc 1977), we held that the doctrine of strict tort liability applies with equal purpose to products liability cases involving problems caused by the way a product has been designed. *Blevins v. Cushman Motors*, 551 S.W.2d at 607. *See also Duke v. Gulf & Western Manufacturing Co.*, 660 S.W.2d 404, 411-12 (Mo.App.1983). In *Blevins*, we took care to stress that under a theory of strict tort liability, the focal point of the litigational process is the condition or character of the product and not the character of the defendant's conduct—

thereby excising the concept of reasonable care, the limits test of liability in negligence law, from Missouri's rule of strict tort liability.[4] *Blevins v. Cushman Motors*, 551 S.W.2d at 608; *see also* Comment a to Section 402A.

Although the focus of a products liability suit brought under a theory of strict tort liability is on the condition or character of the product rather than on the nature of the defendant's conduct, the doctrine of strict tort liability is not, nor was it ever intended to be, an enveloping net of absolute liability. As Roger Traynor, the eminent California jurist most responsible for pioneering the doctrine, noted in his 1965 article, *The Ways and Meanings of Defective Products and Strict Liability*, "[i]t should be clear that the manufacturer is not an insurer for all injuries caused by his products." 32 Tenn.L.Rev. 363 (1965); *see also, Baker v. International Harvester Co.*, 660 S.W.2d 21, 23 (Mo.App.1983) (noting manufacturer does not have a duty to design accident proof product); *Rogers v. Toro Manufacturing Company*, 522 S.W.2d 632, 637 (Mo.App.1975) (noting strict tort liability does not mean absolute liability).

The core concern in strict tort liability law is safety. *See* Comments a through i to Section 402A. Therefore, the primary inquiry in a design defect case is whether the product—because of the way it is designed—creates an unreasonable risk of danger to the consumer or user when put to normal use. *See generally*, Owen and Montgomery, *Reflections On the Theory and Administration of Strict Tort Liability For Defective Products*, 27 S.C.L.Rev. 804, 812-13 (1976). To establish liability in a design defect case, the plaintiff bears the burden of demonstrating that the product, as designed, is unreasonably dangerous and therefore "defective", and that the

---

**3.** The first modern judicial articulation of the basic policy justifications for strict tort liability was by Traynor, J., in his concurring opinion in *Escola v. Coca-Cola Bottling Co.*, 24 Cal.2d 453, 462, 150 P.2d 436, 440 (1944).

**4.** Although the negligence-rooted concept of fault has little if any theoretical utility in the law of strict tort liability, proximate causation and foreseeability are concepts that factor into the calculus of liability in a strict tort liability action. Foreseeability, however, is a determinant of use: it is not a determinant of harm.

demonstrated defect caused his injuries. Though obviously abbreviated, the foregoing explanation describes the heart and soul of a strict tort liability design defect case—unreasonable danger and causation.

In design defect cases, however, the job of defining and giving content to the legal meaning of "defective" has taxed the creative energies of courts and commentators alike and has led Professor Wade to declare that "the determination of when a product is actionable because of the nature of its design appears to be the most agitated controversial question before the courts in the field of products liability." Wade, *On Product Design Defects and Their Actionability*, 33 Vand.L.Rev. 551, 576 (1980). Under the *Restatement*, a product, as designed, is actionable if the product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer, who either purchases it or uses it, with the ordinary knowledge common to the community as to its characteristics.[5] Comments g and i to Section 402A; *see generally, Lester v. Magic Chef, Inc.*, 230 Kan. 643, 641 P.2d 353 (1982).

Despite the pioneering character of Section 402A, the Restatement's consumer expectation test has met with little enthusiasm[6] among legal scholars. The leading commentators in this area of the law would give content to the concept of defectiveness in design defect cases through the use of a multifactor standard, under which the utility of the product is weighed against its demonstrated risks. *See*[7] Wade, *On the Nature of Strict Tort Liability for Prod-*

*ucts*, 44 Miss.L.J. 825 (1973); Keeton, *The Meaning of Defect in Products Liability Law—A Review of Basic Principles*, 45 Mo.L.Rev. 579 (1980); Fischer, *Products Liability—The Meaning of Defect*, 39 Mo. L.Rev. 339 (1974). *But see*, Henderson, *Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication*, 73 Colum.L.Rev. 1531 (1973).

The dissatisfaction with the *Restatement's* consumer expectation formula that first found expression in the law reviews has also taken hold in a number of jurisdictions. *See e.g., Barker v. Lull*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 234–239, 573 P.2d 443, 452–57 (1978) (design defect is defined either by way of plaintiff proving product failed to perform as safely as ordinary consumer would expect or by way of defendant failing to show that benefits of challenged design outweigh the risk of its danger); *see also Campbell v. General Motors, Inc.*, 32 Cal.3d 112, 184 Cal.Rptr. 891, 649 P.2d 224 (1982); *O'Brien v. Muskin Corp.*, 94 N.J. 169, 463 A.2d 298, 303–06 (1983) (defect determined through risk-utility analysis with focus on duty to foreseeable users); *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 463 N.Y.S.2d 398, 450 N.E.2d 204, 207–08, (1983) (product is not reasonably safe if after balancing the product's risks against its utility and cost, the former outweigh the latter, assuming this knowledge was known at time of production); *Phillips v. Kimwood Mach. Co.*, 269 Or. 485, 525 P.2d 1033 (1974) (product is dangerously defective if reasonable manufacturer, considering all the facts and circumstances, would not put it onto the mar-

---

**5.** This language is commonly referred to as "the consumer expectation test".

**6.** A few of the more frequently voiced criticisms which have been leveled at the *Restatement's* approach to determining defectiveness are: (1) the language and terms are unnecessarily redundant; (2) it retains both warranty and negligence characteristics; (3) it fails when applied to open and obvious defects; (4) it goes too far in introducing subjectivity into the litigational process; (5) it rests on the fiction that the consumer or user has expectations even as to the more complex or obscure features and workings of technologically advanced products. *See generally,* Birnbaum, *Unmasking the Test for Design*

*Defect: From Negligence [to Warranty] to Strict Liability to Negligence,* 33 Vand.L.Rev. 593, 611–18 (1980).

**7.** It should be pointed out that this list is by no means complete. There is a virtual ocean of literature on this subject. Furthermore, the precise contours of the proper risk-utility analysis vary from commentator to commentator and from court to court. In addition to the law reviews, the subject is given full treatment in the multivolume work of Professors Louis Frumer and Melvin Friedman, *Products Liability,* Vol. 2, § 16A (1985); *see also* Hursh & Bailey, American Law of Products Liability 2d, chp. 4 (1974).

ket if he had knowledge of its harmful character); *Azzarello v. Black Brothers Co.*, 480 Pa. 547, 391 A.2d 1020 (1978) (product is defective and supplier liable if the product lacked any element necessary to make it safe for its intended use); *Turner v. General Motors Corp.*, 584 S.W.2d 844 (Tex.1979) (defective design means product that is unreasonably dangerous, considering the utility of the product and the risk included.)

Under Missouri's rule of strict tort liability, a product's design is deemed defective, for purposes of imposing liability, when it is shown by a preponderance of evidence that the design renders the product unreasonably dangerous.[8] *Elmore v. Owens-Illinois, Inc.*, 673 S.W.2d 434 (Mo. banc 1984); *see also Johnson v. Hannibal Mower Corporation*, 679 S.W.2d 884, 885 (Mo. App.1984); *Keller v. International Harvester Corp.*, 648 S.W.2d 584, 587–88 (Mo.

App.1983); *Braun v. General Motors Corp.*, 579 S.W.2d 766, 769 n. 3 (Mo.App. 1979); *Cryts v. Ford Motor Co.*, 571 S.W.2d 683, 688 (Mo.App.1978). This Court most recently articulated a formulation of liability for a design defect case in *Elmore v. Owens-Illinois, Inc.*, 673 S.W.2d at 434. In *Elmore*, an asbestosis case brought under a theory of defective design, Judge Higgins, author of the principal opinion, pointed out that the plaintiffs had satisfied their burden of proving the design of the product defective "when they proved it was unreasonably dangerous as designed."[9] *Id.* at 438.

Though Missouri has adopted the rule of strict tort liability as set forth in the *Restatement*, we have not yet formally incorporated, in any meaningful way, the *Restatement's* consumer expectation test into the lexicon of our products liability law.[10]

---

**8.** In *Cronin v. J.B.E. Olson Corp.*, 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153, (1972), the California Supreme Court rejected the use of the concept of "unreasonable danger" as a factor in the equation of strict tort liability because, according to the court, the term has a complexion of negligence. *Cronin v. J.B.E. Olson Corp.*, 104 Cal.Rptr. at 442, 501 P.2d at 1162. We disagree with this view. When the focal point of the litigation is the character of the product and not the quality of the defendant's actions, we think the concept of unreasonable danger is easily distinguishable and quite different from unreasonable conduct. *See* Green, *Strict Liability Under Sections 402A and 4092B: A Decade of Litigation*, 54 Texas L.Rev. 1185, 1203 (1976); *see also* Wade, *On Product "Design Defects" and Their Actionability*, 33 Vand.L.Rev. 551, 557–58, 570 (1980).

**9.** This is so notwithstanding the circuitous terminology that has been consistently employed since we first adopted strict tort liability. *See e.g., Blevins v. Cushman Motors*, 551 S.W.2d at 602 ("we reaffirm that a product may be found to be in a defective condition unreasonably dangerous to the user or consumer ... and, therefore, actionable under § 402A, when the product is found to be defective and dangerous....").

It should also be pointed out that the critical language we set forth in *Keener*, "a product must be defective and therefore dangerous", does not mirror precisely the language found in either Section 402A or that which is found in MAI 25.04(3rd). MAI 25.04(2nd), however, did incorporate the language we set forth in *Keener*,

but has since been superseded by MAI 25.04 (3rd).

**10.** The *Restatement's* consumer contemplation test is a virtual stranger to Missouri's law of strict tort liability. Through our own independent research, we have been able to find only a handful of reported cases decided by our intermediate appellate courts which mention, but do not necessarily apply in any substantive fashion, the consumer contemplation test. *See Racer v. Utterman*, 629 S.W.2d 387 (Mo.App.1981), *cert. denied* and *appeal dismissed, Racer v. Johnson and Johnson*, 459 U.S. 803, 103 S.Ct. 26, 74 L.Ed.2d 42 (1982); *Brawner v. Liberty Industries, Inc.*, 573 S.W.2d 376 (Mo.App.1978); *Cryts v. Ford Motor Company*, 571 S.W.2d 683 (Mo. App.1978). None of these cases indicate whether the test is to be applied subjectively or objectively. *Cf. Uder v. Missouri Farmers Association, Inc.*, 668 S.W.2d 82, 93 (Mo.App.1983) (concluding that "when it is shown that a product failed to meet the reasonable expectations of the user, the inference is that there was some sort of defect, *a precise definition of which is unnecessary*") (our emphasis). Nor do any of these reported decisions indicate whether it should be exclusively a decisional tool for an appellate court or whether it should also be available to trial courts when ruling on summary judgments, directed verdicts and for deciding when to enter a judgment notwithstanding the verdict.

In *Aronson's Men's Stores v. Potter Electric Signal Company, Inc.*, 632 S.W.2d 472, 473–74 (Mo. banc 1982), this Court noted that the *Restatement* defined defectiveness by way of consumer expectations. We stopped short, how-

*But see, Aronson's Men's Stores v. Potter Electric Signal Company, Inc.,* 632 S.W.2d 472 (Mo. banc 1982). Nor have we yet decided to travel or require plaintiffs to travel the path of risks and utilities. And in this connection, we note that none of the parties in the present case, at either the trial level or on appeal, has raised as an issue the applicable standard by which to determine when a product, as designed, is defective and therefore actionable. Moreover, the appellate posture of this case strongly militates against considering this issue sua sponte. Because of these two decisional constraints, we choose not to decide this question and instead, limit our discussion to edificatory ends.

Under our model of strict tort liability the concept of unreasonable danger, which is determinative of whether a product is defective in a design case, is presented to the jury as an ultimate issue without further definition.[11] *See Aronson's Men's Stores v. Potter Electric Signal Company, Inc.,* 632 S.W.2d at 472. Accordingly, our approved jury instruction which governs in a design defect case, MAI 25.04 (3rd) does not contain as one of its component elements a definitional paragraph which gives independent content to the concept of unreasonable danger.

Notwithstanding the minority character of this approach, Professor Leon Green, in his 1976 Texas Law Review article, *Strict Liability Under Sections 402A and 402B: A Decade of Litigation,* explains why an approach that avoids the use of an external standard by which to determine unreasonable danger—*i.e.*, defectiveness—is preferable to one which does use an external standard. He points out first that juries do not have "a fictitious standard by which to determine assault, battery, false imprisonment, nuisance, entry upon land, or the taking of a chattel" and then he suggests that "[n]or do juries need an external standard by which to determine the danger of a product in an unreasonably dangerous defective condition." Green, *Strict Liability Under Sections 402A and 402B: A Decade of Litigation,* 54 Tex.L.Rev. 1185, 1206 (1976). He concludes his discussion with the judgment that "the ritual indulged in by the giving of abstract, abstruse standards, impossible to comply with, only perpetuates the mystical trial by ordeal and *may conceal a hook in a transcendental lure that will snag an appellate court.*" *Id.* at 1206. (emphasis added)

As we noted previously, at the trial of a design defect case, the concept of unreasonable danger is treated as an ultimate issue. The jury gives this concept content by applying their collective intelligence and experience to the broad evidentiary spectrum of facts and circumstances presented by the parties. In the present case, Beech's primary argument is that plaintiffs failed, as a matter of law, to make a submissible case concerning their burden of proving that the elevator trim tab actuators were unreasonably dangerous when put to a reasonably anticipated use. To determine whether plaintiffs did make a submissible case, we must examine the sufficiency of the evidence. *Blevins v. Cushman,* 551 S.W.2d at 606–08. In so doing, plaintiffs are entitled to the most favorable view of all of the evidence and the benefit of all favorable inferences to be fairly drawn from the evidence. *Coulter v. Michelin Tire Corp.,* 622 S.W.2d 421, 426 (Mo.App.1981), *cert. denied, Michelin Tire*

---

ever, of reaching the issue which would have required us to define the concept, and therefore we did not hold that under Missouri law the standard of defectiveness was rooted only in the expectations of the ordinary consumer.

**11.** Most states, whether they apply a unitary definitional test or a multifactor analysis, define to some extent the appropriate standard to the jury. *See e.g., Turner v. General Motors Corp.,* 584 S.W.2d 844, 847 (Tex.1979); *Lester v. Magic Chef, Inc.,* 230 Kan. 643, 641 P.2d 353 (1982).

The subject of how the jury should be instructed and what is the proper role for the jury has been given attention by a number of commentators and courts. *See* Owens and Montgomery, *Reflections on the Theory And Administration of Strict Tort Liability For Defective Products,* 27 S.C.L.R. 803, 830–45 (1976); Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L.J. 825, 838–41 (1973); *see also Phillips v. Kimwood Machine Co.,* 269 Or. 485, 525 P.2d 1033, 1039–40 (1974).

*Corp. v. Coulter*, 456 U.S. 906, 102 S.Ct. 1752, 72 L.Ed.2d 162 (1982).

Plaintiffs' proof on the question of whether Beech's elevator trim tab actuators were unreasonably dangerous when put to a reasonably anticipated use took the following form. Their evidence included the testimony of Robert Lane and Steve Adams, the two Executive mechanics who reversely installed the two actuators. Testimony was also received from Larry Douglas, the Executive maintenance inspector who supervised Lane and Adams and checked their work the day the new actuators were reversely installed.

Weldon Earl Garrelts, an aircraft maintenance engineer in charge of the University of Illinois Federal Aviation Certified Repair Station and assistant professor at the University of Illinois Institute of Aviation, testified as an expert witness. Also testifying were Roger Helms, another Executive maintenance inspector, and Al Graves, Executive's Chief Inspector and Director of Maintenance. In addition to the oral testimony of these six primary witnesses, plaintiffs presented for the jury's consideration a variety of real and demonstrative evidence, which, among other exhibits, included a portion of Beech's engineering manual describing defendant Beech's design criteria policy.

As we noted earlier, the airplane's elevator trim tab actuators were discovered to be worn during a routine FAA required 100 hour inspection. New actuators were ordered from Beech and mechanics Lane and Adams were assigned the task of installing the new actuators. Lane and Adams, both of whom were FAA licensed airframe and power plant mechanics, each testified that it was not possible by visual inspection to determine the right actuator from the left actuator. They also testified that prior to this airplane crash, they were unaware that it was physically possible to reversely install the right and left actuators. Plaintiffs also brought out through Lane and Adam's testimony that neither mechanic had referred to the maintenance manual located at their work station. The evidence, however, also showed that Lane and Adams, in performing their duties that day, assumed that Beech had designed the actuators in compliance with the industry standard which required critical flight parts, like elevator trim tab actuators, to contain design features which precluded the possibility of reverse installation.

Throughout the course of the entire trial, plaintiffs consistently focused on the existence of an industry design criteria standard—which was first brought to the jury's attention by mechanics Lane and Adams. The two terms used most often during the trial to describe this industry standard were "work or no go" and "murphy proof". Stated most simply, this industry standard calls for manufacturers like Beech to design critical flight parts in a way which makes it physically impossible to install them or assemble them in any way but the right way.

In connection with this issue, plaintiffs offered into evidence an exhibit that contained a description of Beech's own design policy. The exhibit was a paragraph from Beech's engineering manual, and it stated the following design policy:

Go Right or No Go. The phrase, "go right or no go" has been assigned to a design criterion adopted by the Army and applicable particularly to aircraft. Essentially, it is a requirement that replaceable parts of aircraft must be so designed that they cannot be installed any way but the right way. As a design policy, it shall apply to all Beech products in applications where the consequence of wrong assembly presents any hazardous condition to the article, its occupants or users.

For accomplishments of this design policy, consider such examples as drilling assembly bolts at odd angles or locations, providing a unique keyway, or making the input and output ends of valves, push-pull rods, etc., different diameters whenever correct assembly is important to safety.

Do not apply this design policy literally to parts which can be more economically

designed interchangeable end for end, providing the intent of installation safety is not jeopardized.

Also introduced into evidence was 14 CFR § 23.685(D) (1981), a FAA regulation requiring the following design characteristics:

Each element of the flight control system must have design features or must be distinctly and permanently marked so as to minimize the possibility of incorrect assembly that could result in the malfunctioning of the control system.

Larry Douglas, the Executive inspector who checked the work of Lane and Adams, testified that in carrying out his duties, he assumed that Beech's parts were "murphy proof" and therefore in conformity with industry standards. Douglas testified further that before this crash, he had never encountered in the course of his work two parts which, although were visually identical but functional opposites, could, nevertheless, be reversely installed.

Additionally, Al Graves, Executive's Director of Maintenance, and former aircraft maintenance instructor for seven years at an FAA approved school, testified that he too could not determine by way of visual inspection which actuator belonged on the right side and which one belonged on the left side. Nor could he determine the identity of the actuators from simply turning the body of the actuators, thus causing the attached rods to move either inward or outward. Mr. Graves also explained that, as designed, the actuators could be reversely installed, but if they had been designed in accordance with a "murphy proof" standard they could only be installed one way—the correct way.

Weldon Earl Garrelts, plaintiffs' expert witness, after having actually demonstrated the reverse installation of two actuators on a replica horizontal stablizer—that portion of the airplane containing the elevators and elevator trim tabs—testified that Beech's actuators were not designed to minimize incorrect installation. He testified further that in his opinion Beech's design failed to satisfy 14 CFR § 23.685(D)

(1981) and that installing Beech's actuators amounted to a game of Russian Roulette. Furthermore, he testified that there did exist an industry standard in connection with the design of critical flight parts and that he first learned it was possible to reversely install the right and left actuators on this model airplane when he became involved with this case.

A key element of plaintiffs' theory of defective design was the feasibility of an alternative design—which would have conformed to the industry standard and which would have guarded against reverse installation. Plaintiffs' expert witness, Mr. Garrelts, provided examples of a number of alternative design features that would have made the actuators safer. One possibility was making the mounting holes for each actuator two different sizes. Therefore, one actuator could not fit into the surface area designed for the other actuator. This same result could also be accomplished by misaligning the mounting holes for one of the two actuators. Additionally, he suggested that the actuators could be physically imprinted with a "R" and "L". Evidence on this issue was also elicited from plaintiffs' other witnesses.

Notwithstanding this body of facts, Beech contends that the evidence, as a matter of law, is insufficient to support a finding that the actuators are unreasonably dangerous when put to a reasonably anticipated use—because the evidence proves that the actuators were used in an abnormal fashion not intended by the manufacturer. Stated somewhat more simply, Beech's argument is that the evidence does not support a finding that they could have reasonably anticipated the reverse installation of these two actuators.

In a strict tort liability action, the plaintiff is required to prove that the product being impugned has been put to a reasonably anticipated use. *Keener v. Dayton Electric Manufacturing Company,* 445 S.W.2d at 366, *Blevins v. Cushman,* 551 S.W.2d at 607; *see also Duke v. Gulf & Western Manufacturing Company,* 660 S.W.2d at 411–12; MAI 25.04 (3rd ed.); *see*

*generally*, Hursh and Bailey, American Law of Products Liability 2d, § 4:40 (1974). The concept of reasonably anticipated use, however, includes misuse and abnormal use which is objectively foreseeable. *Cryts v. Ford Motor Co.*, 571 S.W.2d 683, 688 (Mo. App.1978); *Rogers v. Toro Manufacturing Co.*, 522 S.W.2d 632, 637–38 (Mo.App.1975). This is so in the majority of jurisdictions that have adopted strict tort liability. *See e.g. Brown v. United States Stove Co.*, 98 N.J. 155, 484 A.2d 1234, 1240–41 (1984); *see also Cobb v. Insured Lloyds*, 387 So.2d 13 (La.App.1980), *cert. denied Cobb v. Insured Lloyds*, 394 So.2d 615 (La.1980).

■ The plaintiffs in the present case presented a host of evidence which in combination established the existence of an industry standard that is intended to safeguard against the incorrect installation of symmetrical flight parts that have asymmetrical functions. Additionally, plaintiffs' evidence demonstrated that the industry standard had been adopted by Beech as a design criteria policy. Our review of the sufficiency of the evidence with respect to the issue of normal use leads us to but one conclusion—that there was ample evidence to support a finding that the actuators had been put to a reasonably anticipated use.

Beech posits the additional argument that plaintiffs have failed to establish that George Nesselrode's death was proximately caused by the design of the actuators. Proving proximate cause in a strict tort liability case is a fundamental burden that must be met. MAI 25.04(3rd); *Duke v. Gulf & Western Manufacturing Company*, 660 S.W.2d at 409; *see also Zaft v. Eli Lilly & Co.*, 676 S.W.2d 241, 244 (Mo. banc 1984). In a strict tort liability case, proximate cause enters through a number of different doors. Underneath the conceptual umbrella of proximate cause can be found the concepts of misuse, abnormal use, reasonably anticipated use and contributory fault. *See e.g. Baker v. International Harvester Co.*, 660 S.W.2d 21, 23 (Mo. App.1983); *see generally*, Keeton, *Products Liability and Defenses—Intervening Misconduct*, 15 Forum 109 (Fall 1979).

Ever since the doctrine of strict tort liability was first articulated by Justice Traynor in his concurring opinion in *Escola v. Coca Cola Bottling Co.*, 24 Cal.2d 453, 462, 150 P.2d 436, 440 (1944), proximate cause has been recognized as a conceptual means of limiting the scope of liability in a strict tort liability action. *See* Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss.L.J. 825, 828 (1973); *see generally* Hursh and Baily, American Law of Products Liability 2d, § 4:17 (1974).

■ In the present case, Beech, under the guise of a submissibility argument, seeks to limit its liability by contending that the purported negligence of Executive's mechanics constitutes the sole proximate cause of the accident, which was the immediate cause of George Nesselrode's death. Beech's argument, though admittedly appealing from a distance, falls shy of the mark upon closer inspection. Under established principles of causation, the proximate cause of an event or injury need only be a substantial factor or efficient causal agent. *See Dura Corp. v. Harned*, 703 P.2d 396, 406 (Alaska 1985); *Brown v. United States Stove Co.*, 98 N.J. 155, 484 A.2d 1234, 1243 (1984); *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 463 N.Y. S.2d 398, 450 N.E.2d 204, 209 (1983); *Sumnicht v. Toyota Motor Sales U.S.A., Inc.*, 121 Wis.2d 338, 360 N.W.2d 2, 11 (1984).

■ As we have already determined, there was sufficient evidence to support a finding that Executive's "abnormal use" of the actuators could have been reasonably anticipated. Beech's real contention, however, is that the actions of Executive's mechanics, as a matter of law, constitute a superseding cause sufficient to relieve Beech of any liability. This argument, however, is one that we cannot in good conscience accept. Plaintiffs' entire strategem was directed toward proving that the incorrect installation of physically symmetrical but functionally asymmetrical parts was a natural and expected consequence of manufacturing actuators without "murphy proof" design features. We find the evidence legally sufficient to support a

finding that Beech's design was a proximate cause of George Nesselrode's death.

In summary, we think a jury composed of reasonable men and women could come to the conclusion that actuators lacking "murphy proof" design features, when put to normal use, do present an unreasonable risk of danger. There was ample evidence from which the jury could infer that the risk of incorrect installation is reduced or eliminated when critical flight components contain "murphy proof" design features. They also could conclude that the way in which these actuators were designed was the efficient cause of the accident, notwithstanding Executive's alleged negligence.

In this connection, the jury was free to disbelieve defendant's evidence to the contrary. The jury was provided a number of feasible alternative "murphy proof" designs. They were free to infer that an alternative design would have been safer and would have prevented this accident. It is the function and duty of the jury to reason upon the evidence presented and to draw inferences and reach conclusions. We think the quantum of evidence which plaintiffs presented allowed the jury to do just that.

Next, we turn our attention to the question of whether plaintiffs made a submissible case under a failure to warn theory of liability. Once again, plaintiffs are entitled to the most favorable view of the evidence and the benefit of all advantageous inferences that might reasonably be drawn from the evidence. *See Coulter v. Michelin Tire Corp.,* 622 S.W.2d at 426.

To succeed on the merits in a strict tort liability action brought under a theory of failure to warn, the plaintiff must establish each of the following elements by a preponderance of the evidence:

1. the defendant sold the product in the course of his business;
2. the product was then unreasonably dangerous when put to a reasonable use without knowledge of its characteristics;
3. the defendant did not give an adequate warning of the danger;
4. the product was used in a manner reasonably anticipated;
5. the plaintiff was damaged as a direct result of the product being sold without an adequate warning;

MAI 25.05(3rd)

The *Restatement* recognizes that a product may be rendered unreasonably dangerous and therefore actionable because of the absence of a warning concerning use or misuse, or because the warning that has been given is informationally deficient. *See generally,* Noel, *Products Defective Because of Inadequate Directions or Warnings,* 23 S.W.L.J. 256 (1969). This theory of liability has been expressly recognized in Missouri. *See Duke v. Gulf & Western Manufacturing Co.,* 660 S.W.2d at 418; *Rogers v. Toro Manufacturing Company,* 522 S.W.2d at 632; *see also Racer v. Utterman,* 629 S.W.2d at 393–95 (the need to provide warnings for unavoidably unsafe products).

The determinative issue in a products liability failure to warn case is whether the information accompanying the product effectively communicates to the consumer or user the dangers that inhere in the product during normal use and the dangerous consequences that can or will result from misuse or abnormal use of the product. *See generally,* Hursch & Bailey, American Law of Products Liability 2d § 4:13 (1974). Warnings and directions concerning the proper use of a product and the consequences of misuse are intended primarily to lessen the level of risk. *See e.g., Pell v. Victor J. Andrew High School,* 123 Ill. App.3d 423, 78 Ill.Dec. 739, 462 N.E.2d 858 (1984).

Although there is little debate over the legal destination of a failure to warn case, courts and commentators at this late date remain "betwixt and between" on what theoretical road they should be traveling. The commentary accompanying Section 402A which pertains to failure to warn cases would seem to sanction the imposition of liability only when the defendant has knowledge or should have knowledge

of the product's dangerous propensities. *See* Comment j to Section 402A. Some of the leading commentators also espouse the view that the successful maintenance of a Section 402A failure to warn action requires a showing of negligence. *See, e.g.,* Prosser and Keeton On Torts § 99 (5th ed.). A substantial number of courts also take this position. *See, e.g., Flaminio v. Honda Motor Co., Ltd.,* 733 F.2d 463 (7th Cir.1984) (applying Wisconsin law).

Under the decisional law of Missouri, a plaintiff has two options. He can bring his failure to warn case under a theory of negligence, *Morris v. Shell Oil Co.,* 467 S.W.2d 39 (Mo.1971) (adopting the *Restatement's* Section 388 model of negligent failure to warn), or he can bring his action under Section 402A. *Duke v. Gulf & Western Manufacturing Co.,* 660 S.W.2d at 418. Under the former theory, knowledge is a relevant consideration. But under the latter theory, liability may be imposed without regard to the defendant's knowledge or conduct. This view comports with the very raison d'etre of strict tort liability law. In *Elmore,* we reaffirmed the principle that strict tort liability is not predicated on the presence of fault or the existence of knowledge:

> The manufacturer's standard of care is irrelevant because it relates to the reasonableness of the manufacturer's design choice; fault is an irrelevant consideration on the issue of liability in the strict liability context. Thus, plaintiffs established that Kaylo [the product] was "defective" when they proved that it was unreasonably dangerous as designed; they were not required to show additionally that the manufacturer or designer was "at fault," as that concept is employed in the negligence context.

*Elmore v. Owen-Illinois, Inc.,* 673 S.W.2d at 438.

Strict tort liability recognizes that in today's world consumers can do little to protect themselves from the risk of serious injury caused by defects in the products they purchase. And, the more complex the product, the less opportunity there is for the consumer to guard against deleterious defects. To this extent, the consumer must rely upon the integrity and competency of the business community. History, however, has taught us that negligence liability alone provides an inadequate tort remedy for injured consumers and does little to stimulate greater care in the manufacturing process. Strict tort liability is rooted in these realities.

The imposition of strict tort liability is justified on the grounds that the manufacturer or seller is almost always better equipped than the consumer to endure the economic consequences of accidents caused by defective products. Everything in the marketplace has a price, including profits. Economic responsibility for the debilitating consequences of injuries caused by defective products is but one of the many costs associated with doing business and earning profits. All things considered, we find no unfairness in holding manufacturers and sellers economically and socially responsible for injuries *actually* caused by the products they place for profit in the stream of commerce. In this connection, we agree with the Washington Court of Appeals that the policy concerns which justify holding a manufacturer liable for design or manufacturing defects without regard to the reasonableness of his conduct also justify holding a manufacturer liable without regard to the reasonableness of his conduct " 'where the product poses a danger to the public because of a lurking danger which was not exposed by the manufacturer.' " *Haugen v. Minnesota Mining and Manufacturing,* 15 Wash.App. 379, 550 P.2d 71, 76 (1976), quoting L. Fraumer and M. Friedman, 2 Products Liability § 16A p. 3–336.3 (1960).[12]

**12.** The following courts have rejected the application of traditional negligence principles in strict tort liability failure to warn cases. *See Patricia R. v. Sullivan,* 631 P.2d 91, 102 (Alaska 1981); *Anderson v. Heron Eng'r. Co., Inc.,* 198 Colo. 391, 604 P.2d 674, 679 (1979); *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893, 902 (1975); *Mauch v. Manufacturers Sales & Service, Inc.,* 345 N.W.2d 338, 345–46 (N.D. 1984); *Olson v. A.W. Chesterton Co.,* 256 N.W.2d

In Missouri, the pivotal concerns in a failure to warn case litigated under a theory of strict tort liability are: (1) whether the product is unreasonably dangerous when put to normal use without proper warnings and; (2) whether adequate warnings or any warnings at all were given. *See* MAI 25.05(3rd). Our decisional concern in the present case is whether plaintiffs produced sufficient evidence to support a finding that the actuatros were not accompanied by an adequate warning.

Plaintiffs proof on this issue consisted of the following evidence. First, plaintiffs established through the testimony of Larry Douglas, an Executive inspector, and Al Graves, Director of Maintenance, that the service bulletin they received from Beech advising them to check the elevator trim tab actuators for wear and tear during the next 100 hour inspection did not warn about the possibility of reversely installing the actuators and the dangerous consequences of reverse installation.

By way of oral testimony and documentary evidence, plaintiffs established that Beech's maintenance manual for this model airplane did contain warnings concerning maintenance procedures that affected the safe operation of the airplane. These warnings were printed in bold letter type. Plaintiffs, however, also presented evidence which showed that the maintenance manual did not contain any warnings concerning the possibility of reverse installation and its consequences. In this connection, almost every witness testified that the installation of the actuators was a procedure which affected the safe operation of the airplane.

As we have already observed, plaintiffs presented uncontradicted evidence that the actuators themselves were visually identical. Beech, however, argues that because the actuators had identification numbers stamped on them, they were distinctively marked so as to comply with the FAA regulation requiring each element of the flight control system to have either "mur-

phy proof" design features or distinctive markings.

First, it should be noted that plaintiffs presented testimony from Executive's mechanics and inspectors that the identification numbers stamped in ink on the actuators have no independent meaning without reference to Beech's parts catalog. And, notwithstanding the fact that the numbers were correlated in the parts catalog with a right-hand or left-hand designation, plaintiffs presented evidence that Beech's parts catalog contained a warning that the catalog's sole function was to facilitate ordering parts and was not to be used in connection with the maintenance of the airplane. Additionally, plaintiffs presented further evidence showing that the identification numbers appearing on the actuators themselves were often illegible.

Beech also advances the argument that its maintenance manual contained detailed instructions on the proper installation of actuators. These arguments, however, erroneously equate instructions and identification numbers with warnings. The giving of the former do not as a matter of law eliminate the need for the latter. Notwithstanding the fact that Beech's maintenance manual contained detailed instructions and directions regarding proper installation, it did not contain a warning that brought to Executive's attention the possibility of reverse installation and the dangerous consequences of installing the actuators in a reverse fashion. Nor was any such warning affixed to the actuators themselves.

A number of courts have held there is a distinction between instructions and warnings. *See e.g., Fiorentino v. A.E. Staley Mfg. Co.,* 11 Mass.App. 428, 416 N.E.2d 998, 1003 (1981); *Bituminous Casualty Corp. v. Black & Decker Mfg. Co.,* 518 S.W.2d 868, 873 (Texas Civ.App.1974). *See also* Noel, *Products Defective Because of Inadequate Directions or Warnings,* 23 S.W.L.J. 256, 263 (1969). Warnings signal danger while instructions serve principally to provide the user with information neces-

530, 540 (N.D.1977); *Little v. PPG Industries,* 92 Wash.2d 118, 594 P.2d 911, 914 (1979). *Cf.*

*Phillips v. Kimwood Machine Co.,* 269 Or. 485, 525 P.2d 1033, 1038–39 (1974).

sary to make proper and efficient use of the product. In this case, plaintiffs presented ample evidence to support a finding that Beech's maintenance instructions did not constitute a warning and did not signal the danger that inhered in these actuators. We simply cannot say that as a matter of law plaintiffs failed to meet their burden of producing sufficient evidence showing that the actuators were unreasonably dangerous when used without knowledge of the hazardous propensities of the products' design features.

Beech's final challenge to the submissibility of plaintiffs' case on a failure to warn theory concerns the element of proximate cause. Beech relies heavily on the fact that mechanics Lane and Adams did not consult the maintenance manual when they installed the actuators. Therefore, Beech reasons that the inclusion of "additional warnings" in the maintenance manual would not have prevented the incorrect installation of the actuators. They contend that the mechanics' failure to read the manual negates any connection between the absence of warnings and the cause of the fatal crash.

In making this argument, Beech has omitted critical evidence adduced at trial which supports plaintiffs' position. Our review, however, does not permit us to do the same. Larry Douglas testified that he was familiar with the contents of the maintenance manual because he had cause to read it on prior occasions when called upon to replace worn actuators. Additionally, Al Graves, Executive's Director of Maintenance, testified that he was unaware of any warnings in the maintenance manual or the presence of warnings in any other instructional literature published by Beech which gave notice of the possibility of reverse installation. He testified further that had he known of any warnings concerning the actuators, he would have alerted his mechanics.

We think plaintiffs' evidence would allow the jury to conclude that a warning was needed not only in the maintenance manual but also affixed to the actuators. Furthermore, Al Graves testified that he read Beech's service bulletin and it too lacked a warning. Mechanics Lane and Adams testified that they assumed any deviation from the industry standard would be noted by way of a caution or warning and if that were the case, they would have been made aware of any such warning and the dangers to be avoided. Furthermore, plaintiffs' evidence showed that the Executive employees responsible for ordering parts were also without notice of the dangerous propensities of Beech's actuators.

█ In conclusion, we think the evidence was sufficient to allow a jury composed of men and women with reasonable minds to infer that had Beech either affixed a warning to the actuators themselves, placed a warning in the maintenance manual or parts manual, or warned Executive by way of a service bulletin, Executive would have taken appropriate action to prevent the actuators from being reversely installed. In this respect, the evidence was sufficient to permit the jury to conclude that the instructions and directions found in Beech's maintenance manual and the identification numbers stamped on the actuators did not provide adequate warning and that had adequate warnings been given, the accident would not have occurred. We find that plaintiffs did satisfy their burden of producing sufficient evidence on the element of proximate cause.

The final point of error which we must consider in this appeal raises an issue concerning damages. Fairly stated, both Beech and Executive assign as error the plaintiffs' failure to establish the present worth [13] of decedent Nesselrode's expected

---

**13.** The concept of present worth or value rests on the assumption that money has earning power. Therefore, the value of one dollar today is worth more than one dollar payable at a future date—because the one dollar paid today can, through safe investments, grow and earn additional dollars. Because of the assumed earning power of a sum of money paid today, most American jurisdictions subscribe to the notion that a plaintiff's award of damages representing a loss of future income should be reduced to reflect is present worth—which upon safe in-

loss of future income. The specific assignment of error, however, goes to the trial court's decision to permit the jury to examine during the course of their deliberations a chart (exhibit 63) listing in table format the expected loss of future income—without reduction to its present worth. Defendants contend that allowing the use of this table, which does not reduce the projected stream of loss income to its present value, and permitting plaintiffs to use this table as a foundation for their closing argument constitutes nothing short of reversible error.

We begin with the fundamental proposition that the purpose of awarding compensatory damages in a civil tort action is to make the plaintiff whole again or to place him in a position as near the one he would have occupied had he not been injured as a result of defendant's tortious conduct. McCormick on Damages, § 137 (1935). Therefore, awarding a plaintiff something in excess of just compensation constitutes an act falling outside the purpose of compensatory damages.

In a wrongful death action in Missouri, the only affirmative damages instruction that may be given is MAI 5.01(3rd). This instruction requires the jury to "award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe plaintiff sustained and [will] ... sustain in the future." In this respect, Missouri is not among those jurisdictions which allow a present value instruction to be given upon a proper request by defendant. See e.g., Lees v. Nolan, 121 N.H. 680, 433 A.2d 1287 (1981).

More often than not, the issue of present value arises in connection with the refusal to give a requested instruction or the giving of an improper instruction. See generally Stein, Damages and Recovery §§ 170–175 (1972). In the present case, however, the issue arose not in connection with an alleged instructional error but developed from a series of events and exchanges involving court and counsel.

The issue of present value first appeared at the close of Executive's case in chief. At that time, Executive offered for admission into evidence a set of unofficial interest tables from which present value could be calculated. Up to this point in the trial, none of the parties had touched upon the matter of present value. When Executive sought admission of these interest tables, plaintiffs, in objecting, conceded that the court could freely do so by way of judicial notice[14] but added that absent further foundation and explanation, the interest tables would not assist the jury and should not be admitted. After further dialogue, the trial court noted that it would reserve ruling on the admission of the tables "pending what further evidence [Executive would produce on the issue]."

The issue next appeared after plaintiffs had finished presenting rebuttal evidence at the close of Beech's case in chief. Executive once again sought to offer for admission into evidence their interest table for calculating present value. After Executive briefly explained the purpose of the tables to the court, the trial judge inquired how Executive intended to utilize them at trial. Executive responded that they did not intend to read from them or argue upon them, but rather they wanted only to give them to the jury.

vestment will fully compensate plaintiff for his loss of future income. See generally, Stein, Damages and Recovery, § 170–170.5 (1972).

In 1967, however, the Alaska Supreme Court in Beaulieu v. Elliott, 434 P.2d 665 (Alaska 1967), rejected the concept of present value. The court concluded that, "[s]ince the plaintiff, through the defendant's fault ... has been placed in the position of having no assurance that his award of future earnings, reduced to present value, can be utilized so that he will ultimately realize his full earnings, we believe that justice will best be served by permitting the trier of fact to compute loss of future earnings without reduction to present value." Id. at 671. Beaulieu, however, remains a minority view.

14. We note that Executive represented their interest tables as being part of our Missouri Revised Statutes. They are not statutory tables. They are tables provided by the publishers of Vernons Annotated Missouri Statutes, a private and unofficial publication.

During the course of this dialogue, Executive conceded that the entire matter was subject to argument. And, the court opined that giving the jury the tables without further evidentiary support or argument would amount to giving the jury a roving commission.

The next event to transpire with respect to present value occurred at a bench conference held prior to the giving of jury instructions and closing arguments. Beech noted its objections to plaintiffs' proof of damages and to plaintiffs' failure to reduce their claim of future loss income to present value. Part of this objection went to plaintiffs' chart (exhibit 63) listing the decedent's projected loss of income. The chart was prepared by Otis Roberts, the general manager and vice-president of the company for which Nesselrode worked, and he used the chart when he testified during plaintiffs' case in chief. And it was at that time the chart was admitted into evidence—without any objection by any defendant. Additionally, neither Beech nor Executive raised the issue of present value by way of cross-examination of the plaintiffs' witness.

However, at the bench conference that was held later in the trial and immediately before the giving of instructions and closing statements, both Beech and Executive entered an objection to any arguments plaintiffs' intended to make which would be based on the information contained in the chart showing decedent's projected loss of income. The court considered and rejected these objections and refused to limit the scope of plaintiffs' closing statement.

Plaintiffs' closing statement included the following argument:

Now, the verdict—the monetary verdict—the damage verdict—is composed of two parts: the loss of income, and the loss of love and companionship and consortium; the loss of services, care, society, guidance.

The loss of income is really not that difficult to compute. You can compute it with some mathematical function. The evidence, we know, is that Mr. Nesselrode could have worked with his employer—which he incidentally had worked for since the Fifties, middle Fifties—could have worked until he was 75, Plaintiffs' Exhibit 63 would indicate that he would have earned $980,194.00

\* \* \* \* \* \*

But let me make one more observation on that. If George Nesselrode was worth $980,000.00 to his employer, he was worth $980,000.00 to his family.

.        .        .        .        .

After the jury had retired and begun deliberating, they requested the use of plaintiffs' chart which showed decedent's projected stream of loss income. The court convened an inchambers conference, during which Beech and Executive offered objections to allowing the jury to examine the chart. After considering the parties' views on the subject the court ordered the exhibit sent to the jury.

▮ Notwithstanding the substance of defendants' arguments, we do not think the real issue presented by the foregoing facts is the propriety of the trial court's rulings concerning the jury's use of the plaintiffs' loss of future income chart and the scope of plaintiffs' closing arguments. Instead, we believe the true issue is whether a litigant should be permitted to assign error to a trial court's ruling which concerns his opponent's presentation of a genuinely disputed factual issue when the litigant claiming error has in wholesale fashion abandoned his responsibility to bring forth evidence favorable to his position or at the very least challenge the accuracy of his adversary's evidence.

▮ In Missouri there exists no judicial rule of law barring a defendant from presenting otherwise admissible evidence on the issue of present value. *See Bair v. St. Louis-San Francisco Ry. Co.*, 647 S.W.2d 507 (Mo. banc 1983), *reh'g granted per curiam*, 647 S.W.2d at 513, *cert. denied Burlington Northern, Inc. v. Bair*, 464 U.S. 830, 104 S.Ct. 107, 78 L.Ed.2d 109 (1983). A defendant may raise the issue by way of cross-examination or on direct examination during his case in chief. *Id.* at

513. After doing so, he of course is free to address the issue during his closing statement. From our discussion in *Bair*, it should be clear that the issue of present value is a factual matter appropriate for argument—by those who hold an interest in the subject. *See also Anderson v. Burlington Northern R. Co.*, 700 S.W.2d 469, 476–77 (Mo.App.1985).

The transcript in the present case reveals little if any effort by defendants to bring to the jury's attention their position concerning the issue of present value. First, we consider the matter of Executive's interest tables. Executive conceded that they did not intend to do anything but pass the tables to the jury. There was no intention to present any foundational evidence or any other supporting evidence. Defendants, however, were afforded the opportunity to produce further evidence on the issue, but they declined to do so. In essence, defendants portrayed the process of reducing an award to its present value as largely a cut and dried arithmetical formula. The trial court, however, considered the process to be something more than a rote arithmetical formula. The position taken by the trial court comports with the view held by Jacob Stein, a noted authority on the subject of damages. Mr. Stein's view is that " ... the process of reducing an award to its present value has far less arithmetical precision than a statement of the general rule would indicate." Stein, Damages and Recovery, § 169, p. 329 (1972).

Although defendants refrained from illuminating their position with respect to present value, they ably challenged the basic foundation of plaintiffs' claim for damages. This was done by presenting evidence in connection with decedent's history of health problems, questioning the three daughters' monetary reliance on decedent, and by pointing out through cross-examination that decedent's projected stream of lost income does not take into consideration his income tax obligations.

The fact of the matter is that defendants did not make any credible effort to contest the issue of present value. Whether defendants' failure to do so was a result of trial strategy—rooted in the concern that to do so would emphasize or further legitimate plaintiffs' claim of damages—or whether it was tied to some other reason, they now seek relief from the consequences of their own actions.

When plaintiffs' loss of future income chart was offered into evidence, neither Beech nor Executive entered an objection to its admission. The trial court properly admitted the exhibit. The trial court on numerous occasions provided defendants the opportunity to put on evidence of their own in connection with the issue of present value. However, defendants failed to do so. Instead, they preferred to have the trial court act in their stead.

■ Though we are unwilling to put our stamp of approval on plaintiffs' presentation of damages, we are equally unwilling to denominate as reversible error the trial court's decision to allow into evidence plaintiffs' loss of future income chart and its refusal to restrict the scope of plaintiffs' closing argument. The practical import of our holding is that before a defendant can base an assignment of error on the plaintiff's presentation of damages with respect to reducing a stream of lost future income to its present value, the defendant, at the very least, must meet the evidentiary responsibilities cast upon him by our adversarial system.

The judgment is affirmed.

HIGGINS, C.J., and ROBERTSON and RENDLEN, JJ., concur.

BLACKMAR, J., concurs in separate opinion filed.

DONNELLY, J., dissents in separate opinion filed.

WELLIVER, J., dissents in separate opinion filed and concurs in separate dissenting opinion of DONNELLY, J.

BLACKMAR, Judge, concurring.

I concur in Judge Billings' opinion, and write separately primarily in response to Judge Welliver's dissent.

### I.

Section 402A of the Restatement (Second) of Torts is not statutory law. Nor does it answer all the questions which may be presented by future cases. I disagree with Judge Welliver's suggestion that we should lay down a rule for future cases involving different facts. I prefer the traditional common law practice of case-by-case development of the law. Maybe there will be more reversals if we decline to decide issues not before us, but the alternative of broad judicial legislation is a less desirable one.

Under our system of jury practice, instructions are given in bare outline. Much reliance is placed on counsel's opportunity to argue. As the principal opinion points out, "the concept of unreasonable danger ... is presented to the jury on an ultimate issue without further definition." I believe that the evidence amply supports the submission of "defective condition unreasonably dangerous" with regard to the replacement actuators furnished by Beech. Also, Beech could reasonably anticipate that the people who install its replacement parts will not always act carefully, and may not always make continuing reference to the manual. Instruction # 10 gave both the plaintiffs and Beech ample opportunity to argue their respective positions. The instruction properly submitted the ultimate issues.

I am not certain that the unadorned submission of unreasonable danger as an ultimate issue is appropriate for all products liability cases. I have particular reservation in cases in which a product has apparent social utility and cannot be made wholly safe. But no such issue is presented here. Beech had the means of correcting the defective condition. There was no social utility in the product as manufactured.

### II.

The submission under Instruction # 12, based on failure to warn, is also appropriate. The plaintiffs, of course, had no way of knowing which, if either, of their theories might find favor in the eyes of the jury.

Judge Welliver's argument that a "failure to warn" submission is appropriate only if the jury is required to find that the defendant "knew or should have known" of the danger is particularly inappropriate in this case, in which Beech manufactured the replacement parts and is charged with knowledge of their properties, including the holes of its design which they fit. Jury instruction is required only on genuinely disputed issues of fact. This is not a case in which an unknown danger presents itself in a product, such as a medicine previously assumed to be safe and beneficial. Instruction # 12 properly permitted the jury to argue the issue of absence of warning.

The absence of warning, or means of ready differentiation of the right and left actuators, is a circumstance which might induce the jury to believe that the replacement parts were "unreasonably dangerous." I agree with Judge Billings that there is no utility in introducing concepts of foreseeability into this case, and that the result is in line with *Elmore v. Owens-Illinois, Inc.,* 673 S.W.2d 434 (Mo. banc 1984). We need not speculate about what submission might be required when a useful product is found to present previously unanticipated dangers.[1]

### III.

Our courts perhaps should consider whether an instruction on present worth of future loss, as required in FELA cases by *St. Louis Southwestern Railway Co. v. Dickerson,* —— U.S. ——, 105 S.Ct. 1347, 1349, 84 L.Ed.2d 303 (1985), should be

---

1. Judge Welliver cites *Feldman v. Lederle Laboratories,* 97 N.J. 429, 479 A.2d 374 (1984). This case treats of warnings required in cases involving drugs and other beneficial products which are "unavoidably unsafe," and so is not in point.

made available in other civil actions. In *Bair v. St. Louis-San Francisco Ry. Co.*, 647 S.W.2d 507 (Mo. banc 1983), however, we held that the parties may argue the present value issues without evidence, because it is a matter of common knowledge. The issues may also be raised by evidence.

Plaintiffs' Exhibit 63 properly shows gross figures. I agree with the holding in the principal opinion that the defendants failed to take appropriate and available steps to put these figures in perspective and cannot now complain about the reception of the exhibit into evidence, or argument based on it.

I join in the principal opinion and in the judgment of affirmance.

DONNELLY, Judge, dissenting.

In my view, this cause should be reversed and remanded with directions to enter judgment for Beech Aircraft Corporation. I adopt, without quotation marks, pertinent portions of the opinion written in the Court of Appeals by Judge David J. Dixon and concurred in by Judge Jack P. Pritchard and Judge Charles Shangler:

Turning to Beech's claim that its directed verdict and judgment n.o.v. motions should have been sustained, Beech's brief puts the issue in a straight-forward manner. Plaintiff's submission was under instructions patterned on MAI 25.04 and MAI 25.05, which are predicated upon the strict liability doctrine of RESTATEMENT (SECOND) OF TORTS § 402A as explicated in *Keener v. Dayton Electric Manufacturing Company*, 445 S.W.2d 362 (Mo.1969). Beech first points out that a jury finding, that the product was being "put to a reasonably anticipated use" and that the product was "used in a manner reasonably anticipated," was required by the law and the instructions in the case. Beech asserts that no evidence supports a finding of such essential facts, and that plaintiff's evidence demonstrated the contrary. Beech argues what is obvious from the factual statement: that, in the installation of the parts, Executive and its employees did not comply with the Beech maintenance manual as the FAA regulations required, and, that the Executive personnel did not follow their own operations manual, which required such consultation with the Beech maintenance manual. Beech further notes that, as demonstrated by all the proof in the case, the mechanics who did the work had no experience in the installation, did not have the manual available for immediate use, and did not perform the installation as the manual directed. Beech points to the testimony of all of the witnesses who were knowledgeable about the installation before the aircraft was certified for flight. In further support of its position, Beech details the activities of the inspector who did not consult the manual, but followed an improper inspection procedure which did not verify proper installation. The evidence from all who testified on the subject clearly established that if the inspection procedures outlined in the Beech maintenance manual had been followed, the misinstallation would have been apparent. This is so because the inspection procedures provided that the cockpit control be placed in a specific position and then directed that the trim tabs be inspected to determine if they had moved the correct degrees in the right direction. The inspector admitted that, based upon the improper inspection procedure he followed, he did not have the "slightest idea" if the trim tabs were responsive to the indicated setting in the cockpit. Beech further argues that the Federal Aviation Regulations have the force and effect of the law. *McClenny v. United Air Lines, Inc.*, 178 F.Supp. 372 (W.D.Mo.1959), and *Tilley v. United States*, 375 F.2d 678 (4th Cir. 1967). Beech had the right to presume, in the absence of evidence to the contrary, that the law would be observed in the installation of the parts. *Highfill v. Brown*, 340 S.W.2d 656, 663 (Mo. banc 1960); *Branstetter v. Gerdeman*, 364 Mo. 1230, 274 S.W.2d 240, 246 (1955). Plaintiffs' expert witness, Garrelts, also testified that the manufacturer was entitled to assume that the regulations and the manual would be followed. He further stated that, if the mechanics and inspector had followed the procedures outlined in the manual, the acci-

dent would not have happened. Beech notes that there is no evidence in the case to suggest that a similar incident had ever occurred in the past. All of the witnesses who testified said they had never even heard of such an occurrence. Beech's affirmative evidence was to the effect that, in thousands of airplanes over a substantial number of years, no such misinstallation had ever occurred before.

This case does not involve a mismanufacture or other defect in the operation of the actuator assemblies themselves. Until the parts were installed in a reverse manner, they presented no danger arising from their use. The "manner of use" made the parts malfunction and caused the fatal crash. Thus, that Beech did not design the parts in accordance with "go or no go" principles or that Beech failed to designate them as right-hand or left-hand in some permanent fashion goes only to the issue of preventing the negligent installation or the manner of installation. The "manner of use" must be one that is reasonably anticipated. In *Keener v. Dayton Electric Co.*, *supra*, 445 S.W.2d at 366, the court held:

> [P]laintiff's verdict-directing instruction, failed to require a finding of an essential element. . . .
>
> The instruction is prejudicially erroneous because it failed to require a finding that the pump, as sold by Dayton, was defective and therefore dangerous when put to a *use reasonably anticipated,* and that it was used by Harold Keener in a *manner reasonably anticipated.* The requirement that the person injured be using the product *in a way it was intended to be used* is an element of plaintiff's cause of action. It is not a defense available to the manufacturer or seller as is "contributory fault."

(Emphasis supplied.)

That direction of *Keener* has been followed without variation and is embodied in the language of MAI 25.04 and 25.05, which require a specific finding by the jury that the product "was used in a manner reasonably anticipated." In *Rogers v. Toro Manufacturing Company*, 522 S.W.2d

632, 637 (Mo.App.1975), the court stated the proposition as follows:

> Strict liability does not equate with absolute liability. Before the defendant can be held under the theory of strict liability, plaintiff must not only prove the article was defective and thus dangerous when put to a use reasonably anticipated, *he must also prove that the article was being used in a manner reasonably anticipated* and that damage resulted as a direct result of the article being defective. *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362, 366[7] (Mo.1969).

Thus, the issue under the applicable law is whether the evidence supported a finding that Beech should have reasonably anticipated the manner of use. In determining the liability of the seller of a component part utilized by another defendant in creating a product for use by a consumer, the inquiry must focus upon the reasonably anticipated manner of use by the assembler. The evidence unequivocally demonstrates that the reasonably anticipated manner of use would have resulted in a proper assembly or at least a discovery of the error before the plane flew. Stated conversely, Beech could not reasonably anticipate that Executive would mishandle the assembly as it did. There is simply no evidence to support even an inference that such palpable negligence could be anticipated. Ordinarily, anticipated misuse would be shown by other incidents of such misuse. None of the experienced mechanics, inspectors, and other experts, had ever heard of such an occurrence. No basis exists for a finding that Beech could foresee the improper installation.

Foreseeability or proximate cause in products liability cases focuses upon the uses to be foreseen, and not the harm caused. This distinguishes products liability and negligence. *Cryts v. Ford Motor Co.*, 571 S.W.2d 683 (Mo.App.1978). The foreseeable use, if present, raises the duty to make the use safe. If the use or misuse cannot be anticipated, there is no duty to guard against injury arising from such ab-

normal use. The law of products liability imposes a duty upon sellers of products to make them reasonably safe or non-defective. The limits of that duty are defined by the foreseeability or reasonable anticipation of the product's use or misuse.

What has been said thus far disposes of both the issues of defective design and failure to warn, because the predicate for the failure-to-warn submission is the same as that in a design defect case—the use and the manner of use must be reasonably anticipated before a warning is required. Obviously, a manufacturer cannot warn of an "unanticipated use" or a "manner of use" not anticipated. *Baker v. International Harvester Co.*, 660 S.W.2d 21, 23 (Mo.App.1983). The duty to warn relates, not to an unanticipated use or manner of use, but only to a "use reasonably anticipated." When the product has a defect or danger unknown to the user *when used in the manner to be reasonably anticipated,* the duty to warn arises. *Racer v. Utterman,* 629 S.W.2d 387 (Mo.App.1981). Plaintiffs have cited dictum from *Duke v. Gulf & Western Mfg. Co.,* 660 S.W.2d 404 (Mo.App.1983), in support of the submission of failure to warn. The sentence extracted from *Duke* is as follows:

> The lack of an adequate warning in itself renders a product defective or unreasonably dangerous within the meaning of product liability law. *Alman Bros. Farm & Feed Mill, Inc. v. Diamond Laboratories, Inc.,* 437 F.2d 1295, 1303 (5th Cir.1971); *Martinez v. Dixie Carriers, Inc.,* 529 F.2d 457, 465 (5th Cir.1976); *Gordon v. Niagara Mach. and Tool Works, supra* [574 F.2d 1182] at 1190 [ (5th Cir.1978) ]

*Duke, supra,* 660 S.W.2d at 418. *Duke* dealt with a machine with an inherent defect that rendered it dangerous, and the sentence states the correct rule that, in such cases, a duty to warn exists. The cases cited in support involve vaccines with inherent dangers known to the supplier, and a machinery case, involving an inherent danger known to the supplier.

Moreover, in the instant case, the lack of adequate warning could not even have been a cause in fact of the crash. There is no causal relationship between the lack of warning and the event because of the positive proof of the actions of the employees of Executive. The maintenance manual was not consulted and the directions given were ignored. The mechanics involved did not pay enough attention to the parts to even be able to say whether or not the parts numbers were present. No further warning in the maintenance manual or designation of the parts could have made any difference under the facts of this case. While a presumption may exist that if a warning has been given, it will be heeded, *Racer, supra,* that presumption cannot stand in the face of positive proof that the directions given were not heeded and that the parts' identifying numbers were not even noticed.

Plaintiffs simply do not meet the central issue raised by Beech. Plaintiffs reiterate the proof of the Beech design standard, the FAA regulation, and the lack of a right-hand, left-hand designation on the assemblies. They then assert there was a "fifty-fifth chance" of reverse installation. They quote Garrelts, their expert witness, who likened this chance as "Russian roulette," and then conclude that "the reverse installation was not only reasonably foreseeable but a near certainty." This argument simply ignores the issue posed by these facts: whether Beech could have "reasonably anticipated the manner of use" by Executive of the parts Beech furnished.

Plaintiffs also assert that there was no affirmative evidence that the actuators were misused. That assertion misconceives the applicable rule of law. Although the actuators were utilized for their intended use, the *manner of use* was not one to be reasonably anticipated by Beech.

Under the law and the evidence in this case, the manner of use of the actuators could not have been reasonably anticipated by any reasonable person in Beech's position. In making that assessment, it is, of course, necessary to consider Executive's

technical skill and expertise as a user, which was known to Beech, as well as Beech's knowledge of the FAA regulations. No one can undertake repair such as was done in this case without licensure from the Federal Government. Beech knew that the parts would be used by trained, licensed mechanics and that the installation was subject to inspection by a licensed inspector. The entire scheme of the control and inspection of such repairs was thwarted by the actions of Executive's employees. To say that a manufacturer of parts for aircraft is liable in a products liability sense under these facts would amount to making such a manufacturer an insurer of the work performed by Executive.

I respectfully dissent.

WELLIVER, Judge, dissenting.

I respectfully dissent.

While I am inclined to believe that the court of appeals appropriately dealt with this case on the issue of design defect, and concur in the separate dissenting opinion of Donnelly, J., I am compelled to address what I believe are three other glaring deficiencies in the principal opinion—its failure to adopt a test for "unreasonably dangerous," its misapplication of the law on "failure to warn" cases, and its erroneous treatment of the issue of damages.

I

I agree that the consumer expectation test, first developed in the area of contract law under an implied warranty theory, has come under increasing scrutiny and criticism by courts and commentators. Although not yet introduced into our law, it may well be that the prudent-manufacturer test or the risk-utility test (or the risk-utility test combined with a factor analysis) is the better reasoned approach. I cannot, however, agree with the principal opinion's limiting of its discussion to "edificatory" ends. The approach this Court sanctions, whether in the case *sub judice* or in future cases, will govern how cases shall be argued to the jury and then, if appropriate, briefed on appeal. This is a threshold matter inherent in every strict liability case and by not approving one of the tests, the principal opinion, if effect, leaves all future triers of strict product liability cases at their peril as to choosing a theory of proof at trial.

II

The principal opinion further errs in its resolution of what is necessary to establish liability under a "failure to warn" theory. The principal opinion correctly notes that leading commentators and courts agree that to establish liability under a "failure to warn" theory the defendant must either know or should have known of the dangerous propensities of the product. It then, unwisely I believe, rejects this view because it is said to conflict with the "very raison d'etre of strict tort liability law." The principal opinion relies upon *Elmore v. Owens-Illinois, Inc.* 673 S.W.2d 434 (Mo. banc 1984). There, however, a majority of this Court treated the case as a design defect case and not as a failure to warn case. *Cf.* Comment, When the Best Defense is no Defense: The Future of State-Of-The-Art Evidence in Product Liability Actions in Missouri-Elmore v. Owens-Illinois, 50 Mo.L.Rev. 438 (1985). And, in *Grady v. American Optical Corp.,* 702 S.W.2d 911 (Mo.App.1985), the court in a strict liability failure to warn case noted the difference between negligence and strict liability and proceeded to hold the defendant liable because the defendant knew of the potential harm and failed to include adequate warnings with its product. It is such mixing of theories with little or no analysis that has, no doubt, led some commentators to suggest that courts refrain from creating a strict liability tort for failure to warn without further inquiry into both policy and theory. *See generally* Epstein, Commentary, 58 N.Y.U.L.Rev. 930, 935 (1983); Wade, On the Effect in Product Liability of Knowledge Unavailable Prior to Marketing, 58 N.Y.U.L. Rev. 734 (1983).

It is sometimes said that inadequate or no warnings at all constitute—and are

merely one form of—a design "defect;" and, that because knowledge of the dangerous character of a product is imputed in a strict liability design defect case it should also be imputed when the plaintiff alleges that the product is defective unless there is an accompanying warning of its dangerous character. Unfortunately, such an analysis is both overly simplistic and not warranted as a matter of policy. The initial purpose for allowing recovery under a failure to warn theory was that certain products are inherently dangerous for their intended or foreseeable uses, but these products should not be considered *unreasonably* dangerous as *designed* because they are beneficial to society and designed as flawlessly and economically feasible as possible. The theory arose in vaccine and drug cases, and because any other approach would create "absolute" liability, many courts and the Restatement require that the manufacturer either know or should have known of the dangerous quality of the product before imposing liability for lack of an adequate warning. Comment j to section 402A of the Restatement, therefore, provides in part that the seller give a warning "if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of ... the danger." *See also* Restatement (Second) of Torts § 388. The New Jersey Supreme Court, for example, has held:

> When the strict liability defect consists of an improper design or warning, reasonableness of the defendant's conduct is a factor in determining liability. * * *
>
> Generally, the state of the art in design defect cases and available knowledge in defect warning situations are relevant factors in measuring reasonableness of conduct. * * *
>
> Similarly, as to warnings, generally conduct should be measured by knowledge at the time the manufacturer distributed the product. Did the defendant know, or should he have known of the danger, given the scientific, technological, and other information available when the product was distributed; or, in other words, did he have actual or constructive

knowledge of the danger? * * * Constructive knowledge embraces knowledge that should have been based on information that was reasonably available or obtainable and should have alerted a reasonably prudent person to act. Put another way, would a person of reasonable intelligence or of the superior expertise of the defendant charged with such knowledge conclude that defendant should have alerted the consuming public?

*Feldman v. Lederle Laboratories*, 97 N.J. 429, 479 A.2d 374, 385–86 (1984) (citations omitted). *See generally* W. Kimble & R. Lesher, Products Liability § 193 (1979); Keeton, The Meaning of Defect in Products Liability Law—A Review of Basic Principles, 45 Mo.L.Rev. 579, 586–87 (1980); Robb, A Practical Approach to Use of State of the Art Evidence in Strict Products Liability Cases, 77 Nw.U.L.Rev. 1, 12 (1982); Schwartz, The Post-Sale Duty to Warn: Two Unfortunate Forks in the Road to a Reasonable Doctrine, 58 N.Y.U.L.Rev. 892, 893–84 (1983); Twerski et al., The Use and Abuse of Warnings in Products Liability—Design Defect Litigation Comes of Age, 61 Cornell L.Rev. 495 (1976); Comment, Requiring Omniscience: The Duty to Warn of Scientifically Undiscoverable Product Defects, 71 Geo. L.J. 1635 (1983). Similarly, a California Court noted that

> in all warning cases—even if the plaintiff or the court claims to analyze failure to warn or inadequacy of warning in the context of a strict products liability claim—the tests actually applied condition imposition of liability on the defendant is having actually or constructively known of the risk that triggers the warnings.

*Kearl v. Lederle Laboratories*, 172 Cal. App.3d 812, 218 Cal.Rptr. 453, 465 (1985). *See also Hayes v. Kay Chemical Co.*, 135 Ill.App.3d 932, 90 Ill.Dec. 632, 482 N.E.2d 611 (Ill.App.1985). And, in Arizona, the following instruction has been approved:

> A party who manufactures or sells a product which he has reason to foresee may cause injury from a particular use,

is required to give an adequate warning of the danger. If he fails to do so, he is liable for any injury resulting from the failure to warn.

*Schneider v. Cessna Aircraft,* CCH Products Liability No. 28,916 (Ariz.App.1985). *See also Dart v. Wieve Manufacturing Inc.,* 147 Ariz. 242, 709 P.2d 876, 884 (1985); *Gosewisch v. American Honda Motor Co.,* CCH Products Liability No. 29,267 (Ariz. App.1985); *Brown v. Sears, Roebuck & Co.,* 136 Ariz. 556, 667 P.2d 750 (Ariz.App. 1983).

It may well be that the confusion surrounding this area of the law lies not in the Restatement test itself; rather, it might be argued that a failure to warn theory may not be either necessary under or consistent with § 402A. It is not enough merely to assert that a product may be "defective" absent a warning and not "defective" with a warning. That would mean that the concept of "defective"—or, unreasonably dangerous—rests upon a time continuum whose parimeters remain undefined. *See generally* Wade, On The Effect in Product Liability of Knowledge Unavailable Prior to Marketing, 58 N.Y.U.L.Rev. 734 (1983). And, it also overlooks that if the product is "defective" without the warning strict liability should be imposed not because there was no warning but because the product has been found to be unreasonably dangerous for its anticipated uses. Injecting the issue of warning in this context only confuses the issue by telling the jury that an arguably unreasonably dangerous product could have been made safer by a simple warning; this may be relevant under a risk-utility analysis for a design defect case but it has no place as a separate action under § 402A. The case at bar illustrates this point. The principal opinion holds that the trim tab actuators were unreasonably dangerous and, therefore, actionable under § 402A. That appellant Beech might have excaped liability had adequate warnings, or instructions, accompanied the parts is but one of the reasons why the parts might be unreasonably dangerous. Conversely, had the parts not been unreasonably dangerous then § 402A would not apply. Because the jury was not properly instructed that there must be either actual or constructive knowledge under a failure to warn theory, the cause requires reversal and remand.

### III

On the question of damages, the principal opinion errs in holding that the real issue is not the propriety of the trial court's ruling on the scope of respondent's closing argument. That issue is before this Court.

Victims of a nonintentional tort are entitled to a monetary award equal to the damage they have suffered due to the tortious conduct. C. McCormick, Handbook on the Law of Damages § 137 (1935). Compensatory damages provide relief to the injured party, deter unreasonable and inefficient behavior, create an incentive for wrongfully injured persons to bring suit, and serve as a mechanism for avoiding the uneconomic precautions potential tort victims would undertake if injuries were not compensated. R. Posner, Economic Analysis of Law § 6.12 (1977). An ordinary tort victim is not entitled to more than he or she has lost, and giving him or her more violates the common law of Missouri and would foster improper incentives.

One of the elements of damage in this case is the loss of future earnings. To avoid overcompensation, the lump-sum damage award for loss of future earnings is not equal to the arithmetical sum of the future annual earnings lost. C. McCormick, Handbook on the Law of Damages § 87 (1935); R. Posner, Economic Analysis of Law § 6.13 (1977).

The measure of a lump-sum award for future pecuniary losses arising from a tort is the present worth of the full amount of the loss of what would have been received at the later time.

Restatement (Second) of Torts § 913A (1977). *Accord, St. Louis Southwestern Railway Co. v. Dickerson,* — U.S. —, 105 S.Ct. 1347, 1349, 84 L.Ed.2d 303 (1985); *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983). The law of Missouri is in accord

with these authorities and a plaintiff is not entitled to more than the present value of lost future earnings. *Mattan v. Hoover,* 350 Mo. 506, 166 S.W.2d 557 (1942); *Mickel v. Thompson,* 348 Mo. 991, 156 S.W.2d 721 (1941).

During opening argument, respondents' argued:

Now, the verdict—the monetary verdict—the damage verdict—is composed of two parts: the loss of income, and the loss of love and companionship and consortium; the loss of services, care, society, guidance.

The loss of income is really not that difficult to compute. You can compute it with some mathematical function. The evidence, ..., is that Mr. Nesselrode could have worked ... until he was 75. Had he worked until he was 75, Plaintiff's Exhibit 63 would indicate that he would have earned $980,194.00.

The evidence is also clear that he performed services around the house.... Jane Nesselrode testified was about twelve hundred dollars a year. And again, with some mathematical computations—you know that he had a life expectancy of 15 years: you multiple those two numbers and come up with an amount; and I think that's $19,200.00.

Plaintiffs are also entitled to recover for the funeral expenses, which was $1,000. And I would submit to you, those losses total $1,000,394.00.

During the trial, respondents introduced Plaintiff's Exhibit No. 63, a chart depicting the deceased's alleged future wage history but the chart did not reduce the figures to present value.[1]

During closing argument, respondents argued:

[H]ad he lived, he would have worked until he was 75. And the loss of ages [wages] and fringe benefits, which came in without objection on the part of any-

body in this courtroom—Plaintiff's Exhibit 63—was $980,190.00.

. . . .

That did not include the funeral expenses of a thousand dollars, and the money that Jane Nesselrode must expend over a period of George's lifetime since he is not there for maintenance or for the services that he performed for her—.... It amounted to ... approximately $1,200.00 a year. But over George's life span, if you multiply it by his life expectancy, it would have come to $19,200.00.

. . . .

I submit to you, she's entitled to receive the loss of income and fringe benefits that Mr. Nesselrode would have received over the period of his lifetime.

. . . .

[T]he best formula that we could come up with, which we thought was fair and reasonable to submit to you, was that if the loss of wages and fringe benefits for his lifetime was $980,194.00, certainly the nonpecuniary loss that Jane and the daughters sustained was worth an equal amount.

While deliberating, the jury requested Plaintiff's Exhibit No. 63, received it, and returned a verdict for $1,500,000.00.

Respondents' argument to the jury misstated the law and was clearly prejudicial.[2] Carefully avoiding any mention of "present value," respondents' attorney equated the damages which should be awarded to the net non-present value amounts on Plaintiff's Exhibit No. 63.

The principal opinion contends "that the issue of present value is a factual matter appropriate for argument." I disagree. The issue of present value is a legal matter, and a plaintiff is simply not entitled to more than the present value of the lost future earnings. *See, e.g., Bean v. Norfolk and W. Ry. Co.,* 84 Ill.App.3d 395, 39

1. Since the plaintiff has the burden of proving damages with specificity, *Sampson v. Missouri Pacific R.R. Co.,* 560 S.W.2d 573 (Mo. banc 1978), there must be situations where the plaintiff must introduce evidence of present value.

2. The lack of a present value instruction allows the jury to be more easily misled.

Ill.Dec. 665, 405 N.E.2d 418 (1980); *Paducah Area Public Library v. Terry*, 655 S.W.2d 19 (Ky.App.1983); *Currie v. Fiting*, 375 Mich. 440, 134 N.W.2d 611 (1965); *Harper v. National Shoes, Inc.*, 98 Mich.App. 353, 296 N.W.2d 1 (1979); *Oberhelman v. Blount*, 196 Neb. 42, 241 N.W.2d 355 (1976); *King v. Britt*, 267 N.C. 594, 148 S.E.2d 594 (1966); *Plourd v. Southern Pacific Transp. Co.*, 266 Or. 666, 513 P.2d 1140 (1973); *Osborne v. Bessonette*, 265 Ore. 224, 508 P.2d 185 (1973); *Johnson v. Pearson Agri-Systems, Inc.*, 119 Wis.2d 766, 350 N.W.2d 127 (1984); *DeChico v. Metro-North Commuter R.R.*, 758 F.2d 856 (2nd Cir.1985); *Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233 (5th Cir.1985); *Metz v. United Technologies Corp.* 754 F.2d 63 (2nd Cir.1985); *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983); *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963 (7th Cir.1983); *Hoskie v. United States*, 666 F.2d 1353 (10th Cir. 1981); *Chiarello v. Domenico Bus Service, Inc.*, 542 F.2d 883 (2nd Cir.1976).

The principal opinion also asserts that appellants have not preserved this issue on appeal. Appellants, however, objected to respondents' valuation argument at the close of the evidence immediately before respondents' closing argument, and their objection was in compliance with the Committee's Comment to MAI 5.01:

> During the instruction conference the parties and the Court should discuss (off the record) just what damages are supported by the evidence and properly can be argued to the jury. In this way, the jury arguments can proceed without undue interruptions.

Appellants' objection was overruled. Because respondents' closing argument on damages was improper and prejudicial, the cause should be reversed and remanded.