Charles Franklin WESTBROOK, Jr., et al., Plaintiffs-Appellees,

Pilot Point Ready-Mix, Inc., Intervenor-Appellee,

v.

GENERAL TIRE AND RUBBER COMPANY, etc., Defendant-Appellant.

No. 83–2733.

United States Court of Appeals, Fifth Circuit.

March 11, 1985.

Rehearing and Rehearing En Banc Denied April 8, 1985.

David W. Townend, Dallas, Tex., for defendant-appellant.

David M. Stagner, Sherman, Tex., for appellees.

Before CLARK, Chief Judge, GOLDBERG, and RUBIN, Circuit Judges.

PER CURIAM:

This products liability action arose out of an accident caused by a tire blow out. Defendant, General Tire and Rubber Compa-

ny (General Tire), appeals from a jury verdict finding it liable and awarding damages for injuries and losses suffered by plaintiffs, Charles and Kathy Westbrook. The jury's verdict on liability is supported by the evidence and uninfluenced by prejudicial error. However, the award of damages, which is at or above the highest permissible range, results from the prejudicial influence of improper argument. The trial court abused its discretion in denying a new trial on the issue of damages. We remand for a new trial on the issue of damages only.[1]

General Tire requests reversal, a new trial, or in the alternative, remittitur. It asserts the district court erred in admitting the opinion testimony of Westbrook's tire expert without a proper predicate and in submitting the issue of liability to the jury without sufficient evidence. General Tire's request for a new trial asserts abuse of discretion in disqualifying General Tire's original counsel, in denying a one week continuance, and in improper comments by the trial judge. These contentions implicate matters within the discretion of the trial court and the jury's weighing of conflicting opinions and underlying fact. We find no merit to any of these contentions, nor any precedential reason to analyze them further. Therefore, we limit this opinion to a discussion of General Tire's complaints that the damages awarded to Charles and Kathy Westbrook were excessive.

### I. Proof of Damages

The facts of the accident itself are undisputed. In mid-July 1979, Charles Westbrook was driving a cement mixer truck on a highway near McKinney, Texas when the right front tire, which was manufactured by General Tire, failed. The truck veered into a ditch and overturned.

The physical injuries suffered by Westbrook also are not substantially in dispute. Testimony by Dr. Robert Allred, the ortho-

1. Pilot Point Ready-Mix, Inc., owner of the cement truck involved in this accident, intervened in this case claiming damages to its truck. The damages were stipulated at $16,000. Because the jury's finding of liability is valid, and the amount of damages suffered by Pilot Point is uncontested, we affirm the judgment as it applies to Pilot Point.

pedic physician who treated Westbrook on the day of the accident and thereafter, indicated that Westbrook suffered contusions, lacerations and burns on his shoulder, a broken nose, fractured ribs, abrasions and cartilage damage to his left knee, and pulled muscles in his back, thighs and legs. His most serious and debilitating injury was to his back. The odontoid process, which is a part of the second vertebra in the neck, at the base of the skull was fractured. Westbrook also suffered a compression fracture of a lumbar vertebra. An examination by a second orthopedic surgeon in November 1981 revealed evidence that a third vertebra was possibly fractured. Injuries to Westbrook's right hand required immediate surgery to repair a severed artery, nerve and tendon. Additional surgery was required in March 1980 to remove a band of scar tissue from his left knee.

As the fractured vertebrae in his neck and back healed, Westbrook wore a halo immobilization jacket for two months to prevent paraplegia. This device consisted of a metal ring which encircled Westbrook's head and was attached through the skull with four metal screws. The halo was connected by metal rods to a hard plastic vest which covered the front and back of Westbrook's torso in a harness-like brace.

A second orthopedic surgeon, Dr. David Webb, examined Westbrook in November 1981. Dr. Webb testified his examination revealed that motion was restricted in Westbrook's neck and lower back, his right hand evidenced multiple lacerations and a decreased sensation of feeling in the web space between the thumb and index finger and he had lost a slight degree of bending ability in his thumb. He believed Westbrook would be likely to have some problems with his knee in the future, causing "some disability." Dr. Webb noticed evidence of three fractured vertebrae, all of which appeared healed. He testified that because of these injuries Westbrook faced a greater probability of reinjury to his back and that continued bending and lifting would further aggravate his back prob-

lems. Dr. Webb also pointed out that Westbrook's neck injuries made him prone to more serious difficulties should he reinjure his neck. In Dr. Webb's opinion, Westbrook would be unable to work an eight hour day at jobs involving physical labor of the type he held prior to the accident; he probably would not pass a typical pre-employment physical, and truck driving would no longer be a suitable occupation because the ride was too rough.

Although the injuries were undisputed, their effect on Westbrook's post-accident earning capacity was contested. Westbrook, a 27 year old high school graduate at the time of the accident, was making $220 per week as a truck driver for Pilot Point Ready-Mix. he had been employed by Pilot Point for less than one month. Since graduating from high school in 1971, Westbrook had held a variety of jobs, including carpenter, cement finisher, roofer, dogcatcher and a member of the National Guard. In January 1980, six months after the accident, Westbrook returned to Pilot Point full time doing light work for the first two weeks until he could resume his regular truck driving duties. As a truck driver for Pilot Point, Westbrook did little or no lifting and stooping. Nevertheless, Westbrook testified the rough ride aggravated his back and caused him constant pain. He had to stop and rest his back for 15 to 20 minutes at each end of his route which reduced the number of loads he could run. A few times he had to stop at a roadside park to lie down on a picnic table. He had trouble sleeping at night and missed two or three days of work a month from back pain and sleeplessness. Westbrook wore a back brace while he was driving to alleviate the pain. He also took prescription pain medicine.

Westbrook testified that he left Pilot Point in 1981 because he could not make enough money on the reduced hours he was able to work. Westbrook went to work for another company as a truck driver. This job involved quite a bit of lifting. Westbrook strained his back on the second day, necessitating a trip to the emergency

room for severe back spasms. Westbrook did not return to that job, but went to work for still another company a week later. This third truck driving job lasted one day because the schedule did not permit him to rest his back between loads. After yet another short lived attempt at truck driving, Westbrook sought a job that would require little lifting, stooping, or long periods of sitting. Between November, 1981 and March, 1982, he worked on a horse ranch as a welder earning $12.00 an hour. Westbrook was laid off when the ranch exhausted its finances, and he remained unemployed from March, 1982 until November, 1982 when he returned to the ranch, but was laid off again in January 1983. During the spring of 1983, he did occasional odd jobs, earned an average of $5.00–$6.00 per hour as a self-employed welder, and worked for two weeks as a cement truck driver in June of 1983. This driving job involved short delivery runs and little time in the truck, but some lifting which bothered his back. He resigned voluntarily because he expected the welding job at the ranch to become available again, but it did not. In the summer of 1983, he worked as a brick layer's helper at $5.00 an hour for a friend who allowed him to work at his own pace and did not require him to do heavy lifting. Still, after a few hours his back would stiffen, making him less productive for the rest of the day. From this evidence, the jury could have deduced that although Westbrook was eager to work, he would be unable to work as a truck driver or at jobs requiring physical labor.

Regarding his decreased ability to enjoy life, Westbrook testified he could no longer ride and break horses or water ski. He cannot sit for long periods in the car, as his back stiffens. He cannot help his wife much around the house and they no longer participate together in many leisure activities. He is uncomfortable walking great distances and must be careful of his left knee which frequently "pops out." Although he has been coon hunting more than 100 times since the accident, he no longer follows the dogs through the woods.

Rather, he just sits on the back of the truck with his friends and listens to the dogs as they run.

Kathy Westbrook testified that since 1979 she has become the primary wage earner. She has held full time employment since 1974, except for time she took off to have a baby. Since the accident, she and her husband have been unable to ride horses together. He is less able to help around the house. He has trouble mowing the lawn because of his knee. She has to do most of the lifting and pulling around the house. She has to assist him getting out of the car. He is irritable when he comes home from work and often just lies down on the couch or the floor. Because he cannot hold down a job, he gets angry and frustrated more often; this has affected his relationship with the children. There have been financial problems, including repossession of Mrs. Westbrook's car and a foreclosure on their house. They had been married twelve years and have two children. Their sexual relations have dropped off from two or three times a week before the accident to less than once a week since the accident.

The jury, by special verdicts, awarded Charles Westbrook damages of $925,000, plus $7,011.89 for undisputed medical bills. It awarded $59,000 to Kathy Westbrook for loss of consortium.

This evidence, viewed in the light most favorable to Westbrook, shows a serious, painful injury. Although his fractured vertebrae and other injuries are completely healed, his activity is restricted due to continued pain and discomfort. The injuries to his knee and lower back have caused some disability which limits him to jobs requiring little physical exertion, but have not prohibited him from working altogether. Due to these difficulties he has had trouble holding a job, despite diligent efforts to secure employment. The resulting financial insecurity has caused mental anguish and family strife. Although he is vulnerable to more serious problems should he reinjure his back, the only future medical expenses testified to at trial pertained to a second knee operation at a cost of $3,300.

## II. *Argument to the Jury*

■ General Tire asserts that the amount of the damage award is excessive and reflects passion and prejudice evoked in Westbrook's final argument. Federal law determines the procedural question of whether a court, sitting in diversity, should grant a new trial based on excessive damages. *Lowe v. General Motors Corp.*, 624 F.2d 1373, 1383 (5th Cir.1980); *see also Galard v. Johnson*, 504 F.2d 1198, 1200, n. 1 (7th Cir.1974). When a closing argument is challenged for impropriety or error, the entire argument should be reviewed within the context of the court's rulings on objections, the jury charge, and any corrective measures applied by the trial court. Alleged improprieties may well be cured by an admonition or charge to the jury. In making this analysis, we agree with General Tire's claim that Westbrook's invocation of the conscience of the community in his final argument so exceeded the limits of advocacy as to cause a prejudicial verdict. In addition, we note sua sponte that Westbrook used an impermissible unit of time argument which obviously bloated the damage award. Because we find prejudicial arguments remained uncorrected and combined to produce a damage award at or above the highest permissible range allowable by the evidence adduced, we hold that the district court abused its discretion by not granting a new trial.

### A. *Conscience of the Community*

■ In closing, Westbrook's attorney told the jury, "You're going to be the conscience of the community with this verdict." After a second reference to this communal responsibility, General Tire's counsel objected[2] and was overruled. Evidently encouraged, Westbrook's attorney continued to interject into his argument references to a community standard or expectation which would be disappointed unless the jury returned a large verdict in Westbrook's favor.[3] This us-against-them plea can have no appeal other than to prejudice by pitting "the community" against a nonresident corporation. Such argument is an improper distraction from the jury's sworn duty to reach a fair, honest and just verdict according to the facts and evidence presented at trial. The district court erred in overruling General Tire's objection and permitting Westbrook's counsel to proceed in this fashion.

Westbrook refers us to *Collins v. Wayne Corp.*, 621 F.2d 777 (5th Cir.1980), as authority from this court for a "community conscience" argument. Westbrook's reliance is inapposite. It is true that in *Collins* plaintiffs' counsel made a community conscience argument in a products liability case against an out-of-state corporation. However, this court neither approved nor disapproved of such argument. It merely mentioned that the argument was made. 621 F.2d at 787. In *Collins*, these statements were obviously harmless as the jury found defendant corporation not liable, a verdict upheld on appeal.

■ Our condemnation of a "community conscience" argument is not limited to the

2. Westbrook's counsel:
  "I hope you do something to make this community proud; be proud of yourself. Do something worthwhile, not only for Charles and Kathy Westbrook, but more importantly...." (Counsel did not finish this thought.)
  General Tire's counsel:
  "I'm going to object to that. I think that's an improper argument for him to suggest that the community might not be proud of another verdict."

3. "If you come up and write that figure in [$925,000], you can leave this courthouse proud and you don't have to go and be apologetic to anyone."

  "In this case they come in here ... with falsified reports. Is that the kind of thing we are going to reward in this community? I hope it is not."
  "What kind of man is Charles Westbrook? He's just the salt of the earth. Just a common old boy. I hope that you hold to General Tire that those kinds of citizens in our community are worth something. I hope that they don't look down at us because we are common people."
  "I would just like to ask General Tire if they think a million dollars is too much to put on this table and ask you, tell you folks how they can use it better."

use of those specific words; it extends to all impassioned and prejudicial pleas intended to evoke a sense of community loyalty, duty and expectation. Such appeals serve no proper purpose and carry the potential of substantial injustice when invoked against outsiders.

### B. *Unit of Time*

In reviewing the entire argument in context as we must, we also note that the jury appears to have adopted counsel's unit of time argument which urged the jury to evaluate a long period of pain and suffering, or loss, as a multiple of its smaller time equivalents. In arguing the damages due Kathy Westbrook for loss of consortium, counsel suggested a figure of $25 per week as reasonable to compensate her loss. Counsel then calculated her cumulative loss at $25 per week over the course of Charles Westbrook's stipulated life expectancy of 45.6 years to be $59,280. The jury awarded Kathy Westbrook $59,000.

In a similar manner, counsel used $1.00 per waking hour as a sum which would adequately compensate Charles Westbrook for his future pain, suffering, and mental anguish. Again, counsel did his arithmetic and arrived at a figure of $298,711.20.[4] Similarly, counsel set $1.00 per waking hour as the worth attributable to Westbrook's loss of the capacity to enjoy life and reached a total of $298,711.20 over 45.6 years. Consequently, for pain, suffering, mental anguish, and restrictions on leisure activities caused by the accident, counsel calculated a damage figure of $597,000.

Counsel then argued that lost earnings should be awarded by assuming Westbrook would experience 38 years of diminished earning capacity. By working at minimum wage over those 38 years, Westbrook would lose $328,000 in income he could have made as a truck driver. Counsel then calculated for the jury that $597,000 for pain, suffering, mental anguish and loss of life's enjoyment, plus $328,000 for lost

earnings, totaled $925,000. It is the exact figure the jury awarded.

It is difficult to evaluate whether awards for pain and suffering are excessive. Here, the jury was not asked to delineate the portion of damages awarded for lost earnings and the amount awarded for pain and suffering. However, because Westbrook's request was granted to the penny, we can safely assume that $597,000 represented damages for pain, suffering and diminished capacity to enjoy life, while $328,000 was intended to compensate for lost earnings. Looking at the lost earnings sum alone, we are drawn to notice the extreme generosity of this award.

Lost future earnings provide the victim with a sum of money to replace the money he would have earned. The law requires and this jury was instructed to make a reasonable adjustment for the present value of this lump sum by taking into account the rate of return Westbrook could be expected to receive upon investing this money at the prevailing interest rate. *See Culver v. Slater Boat Co.,* 722 F.2d 114 (5th Cir.1983) (en banc). Westbrook's award could be invested in a wide variety of securities which would yield varying rates. However, if we were to make a conservative assumption that Westbrook would invest this lump sum award in secure long-term bonds, at a currently available interest rate of 10%, he would receive an annual income of $32,800 for the rest of his life without ever touching the principal. A yearly income of $32,800 is more than double the $15,600 a year the proof showed Westbrook would have made as a truck driver for Pilot Point. When we add the $597,000 arrived at by using a unit of time formula, we can confidently state that the entire award of $925,000 is at or above the maximum permissible award.

The propriety of an argument is a matter of federal trial procedure under *Byrd v. Blue Ridge Rural Electric Coop-*

---

**4.** According to our calculations, counsel must have used 18 as the number of waking hours in a day to arrive at this figure.

*erative, Inc.,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), and therefore, in a diversity case, subject to federal rather than state law. *Baron Tube Co. v. Transport Insurance Co.,* 365 F.2d 858, 862 (5th Cir. 1966) (en banc); *Johnson v. Colglazier,* 348 F.2d 420, 422–23 (5th Cir.1965). Consequently, whether Texas permits carte blanche use of a unit of time argument is not controlling.

Breaking down a large time span into its smaller parts of weeks, days or even hours holds a great appeal to a juror looking for a more understandable and manageable way to approach the task of fixing damages. However, this court has found such arguments impermissible because they tend to produce excessive verdicts. *Baron Tube Co. v. Transport Insurance Co.,* 365 F.2d 858 (5th Cir.1966) (en banc); *see also, Johnson v. Colglazier,* 348 F.2d 420 (5th Cir.1965); *Henderson v. S.C. Loveland Co., Inc.,* 390 F.Supp. 347, 352 (N.D.Fla. 1974). This tendency came to fruition in Charles Westbrook's case.

In *Baron Tube,* this court stated:

> [T]he [unit of time] argument cannot be supported by evidence because pain and suffering cannot be measured in dollars on a unit of time basis; that the amount of such damages must necessarily be left, without mathematical formula, to the sound discretion of the jury, because there is no mathematical rule by which the equivalent of such injuries in money can be legally determined; that such arguments create an illusion of certainty in the jury's mind which does not and cannot in fact exist; and that the whole argument is designed and framed to present an appeal to the jurors to put themselves in the plaintiff's shoes.

365 F.2d at 864.

The court went on, however, to recognize that such arguments are "not improper where accompanied by a suitable caution-

ary instruction" to protect against an excessive verdict. *Id.* The en banc court further emphasized its holding by stating that while a trial judge has much discretion in the means employed to protect against excessive verdicts, a cautionary instruction should have been given to ameliorate the effects of a unit of time argument. "We hasten to reiterate that these matters, *except for requiring a cautionary instruction,* are left to the discretion of the trial court." *Id.* at 865 (emphasis added).

█ No cautionary instruction was given in this case. Furthermore, General Tire neither objected to the argument nor requested a cautionary instruction. Indeed, it has not raised this error in disputing the excessive verdict on this appeal. Nevertheless, the specific challenge to the amount of the award has directly led us to this error. That the jury awarded precisely the amount of money the formula produced is conclusive evidence that the jury adopted the unit of time formula. Thus, we are convinced that the size of this award is, in part, directly attributable to an uncorrected unit of time argument. This implicates the concerns expressed in *Baron Tube.*[5]

### C. *Impact of the Errors*

Many cases in our circuit deal with an excessive damage award on appeal. In most, the court appears to be struck initially with the size of the verdict. The court then appears to review the record of the trial proceedings to determine what caused the jury to make such an award. As with other cases, the size of the Westbrook award triggers our analysis. After reviewing the record and the evidence pertaining to damages, we find substantial reason to question the award. It borders on the excessive, if it does not surpass it. We are led to conclude that something besides the evidence was at work.

---

5. We caution that we do not read *Baron Tube* to hold a unit of time argument reversible per se. Rather, such argument may be allowed when couched with proper safeguards or otherwise cured. *See Country Mutual Insurance Co. v.*

*Eastman,* 356 F.2d 880 (5th Cir.1966) (excessive verdict resulting from unobjected to unit of time argument cured by district court's entry of remittitur) (cited with approval in *Baron Tube,* 365 F.2d at 861).

In determining what influenced this jury to make this award, we are directed first to the final argument by General Tire's objection to the prejudicial statements concerning community conscience. We cannot look at the objected to material in isolation, however. A review of the entire argument reveals that while General Tire objected to just one community conscience statement, similar statements pervaded Westbrook's argument. When viewed with the size of the verdict, these statements were of inescapable influence. For the reasons previously discussed, such appeals to local bias against an outsider are prejudicial, and a large verdict accompanied by such appeals leads us to conclude they had an influential impact upon the jury's deliberations. Further, our task to determine the cause of this verdict causes us to notice the unit of time argument, which although unobjected to at trial, obviously had added prejudicial influence and therefore cannot be ignored.

In this case, both the appeal to community conscience and the unit of time formula were submitted to the jury unchecked. Neither was neutralized at any later point. Such arguments, together with the amount of the award, justify our conclusion that the jury's award was influenced by these improper arguments. While impropriety may be inferred from excessiveness alone, *Evers v. Equifax, Inc.*, 650 F.2d 793, 798 (5th Cir.1981), here, in addition to a large verdict, we have persuasive evidence of improper appeals.

### III. *Applying the Law*

■ Jury verdicts on damages may be overturned only upon a clear showing of excessiveness or upon a showing that they were influenced by passion or prejudice. *See, e.g., Martin v. City of New Orleans,* 678 F.2d 1321, 1326–27 (5th Cir.1982); *Shows v. Jamison Bedding, Inc.,* 671 F.2d 927, 934 (5th Cir.1982). This case presents both a question of excessiveness and established prejudicial error.

■ The decision to grant or deny a motion for a new trial rests in the sound discretion of the trial judge; that discretion can be set aside only upon a clear showing of abuse, *Franks v. Associated Air Center, Inc.,* 663 F.2d 583, 586 (5th Cir.1981); *Evers v. Equifax, Inc.,* 650 F.2d at 796, which evinces an error of law in a ruling below. *Silverman v. Travelers Insurance Co.,* 277 F.2d 257, 259 (5th Cir.1960). Where, as here, the trial judge has denied the motion and left the decision of the jury in tact, this circuit has shown even greater deference to the trial judge's discretion. *Franks,* 663 F.2d at 586; *see also, Reeves v. General Foods Corp.,* 682 F.2d 515, 519 (5th Cir.1982). However, this deference cannot exceed a due regard for what is right and the interests of justice. *New Orleans v. Hewett Oil Co.,* 341 F.2d 406, 410 (5th Cir.1965). When this court is left with the perception that the verdict resulted from prejudicial error, deference must be abandoned.[6]

■ When a jury verdict results from passion or prejudice, a new trial is the proper remedy rather than remittitur. *Evers v. Equifax,* 650 F.2d at 797; *Lowe v. General Motors Corp.,* 624 F.2d at 1383; *Brabham v. Mississippi,* 96 F.2d 210, 213 (5th Cir.1938). Although decisions have deviated from this rule, *see, e.g., Edwards v. Sears, Roebuck and Co.,* 512 F.2d 276, 281–82 (5th Cir.1975); *Gorsalitz v. Olin Mathieson Chemical Corp.,* 429 F.2d 1033, 1043 (5th Cir.1970), the better approach is to require a new trial on any issue infected by passion and prejudice and employ remittitur for those verdicts which are excessive, that is, so large as to be contrary to right reason. *See, e.g., Caldarera v. Eastern Airlines, Inc.,* 705 F.2d 778, 784 (5th Cir.

---

6. For examples of cases where this circuit ordered a new trial because the damage award reflected a prejudicial error in the proceedings, see *Silverman v. Travelers Insurance Co.,* 277 F.2d 257, 263 (5th Cir.1960); *Indamer Corp. v. Crandon,* 217 F.2d 391 (5th Cir.1954) (jury heard improper evidence of insurance payments); *Commercial Credit Corp. v. Pepper,* 187 F.2d 71 (5th Cir.1951) (error in submitting cancelled checks to the jury); *Legler v. Kennington-Saenger Theatres,* 172 F.2d 982 (5th Cir.1949) (error in submitting issue of contributory negligence to the jury).

1983); *Howell v. Marmpegaso Compania Naviera, S.A.*, 536 F.2d 1032, 1034 (5th Cir.1976). Because this jury was influenced by erroneous argument, it is appropriate for us to order a new trial rather than remittitur.

■ Although today's case must be remanded due to prejudicial error, we need not remand for a new trial on all issues. In granting a new trial in whole or in part, we take care to avoid substituting our judgment for that of the jury. *Love v. Sessions*, 568 F.2d 357, 361 (5th Cir.1978); *Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033 (1970) *modified*, 456 F.2d 180 (5th Cir.1972). It is well settled that a new trial on part of the issues is properly resorted to if "it clearly appears that the issue to be retried is so distinct and separate from the others that a trial of it alone may be without injustice." *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931); *Lucas v. American Mfg. Co.*, 630 F.2d 291, 294 (5th Cir.1980). Because in this case the factual questions relating to damages are sufficiently distinct and independent of those questions pertaining to liability, damages can be tried separately. *Cf. Gasoline Products*, 283 U.S. at 499–500, 51 S.Ct. at 515 (damages for contract breach undeterminable without knowing the terms and material dates thus interweaving liability with damages); *Lucas*, 630 F.2d at 294 (evidence of compromise verdict tainted issues of liability and damages so as to require complete new trial).

■ A new trial on the issue of damages, once liability is established, is proper. *See, e.g., Davis v. Becker & Associates, Inc.*, 608 F.2d 621 (5th Cir.1979); *Parker v. Wideman*, 380 F.2d 433, 437 (5th Cir.1967); *New Orleans & Northeastern Railroad Co. v. Hewett Co.*, 341 F.2d 406, 410 (5th Cir.1965). A jury's assessment of damages may be influenced by impermissible factors even though it reaches an acceptable verdict on liability. *See Nicholson v. Bates*, 544 F.Supp. 256, 257 (E.D.Tex.1982). However, the converse is not true. If the ver-

dict on liability were to show evidence of influence by passion, prejudice, compromise, prejudicial error, or misconduct, then a complete new trial would be necessary. *Evers v. Equifax*, 650 F.2d at 798; *Lowe v. General Motors Corp.*, 624 F.2d at 1383; *International Paper Co. v. Busby*, 182 F.2d 790, 792 (5th Cir.1950).

■ There is no indication here of a compromise verdict. To the contrary, the extremely high amount of the award and the jury's willingness to give plaintiffs all they asked for suggests the jury had little doubt that General Tire should be held responsible for the manufacturing defect which was found to have caused Westbrook's injuries.

Liability was the principal focus of the trial. Each side presented experts to testify as to whether a manufacturing defect existed and whether such defect was the proximate cause of this accident. The qualifications of these experts and their tests on this failed tire were subject to vigorous cross examination. The evidence of liability was sufficient. We cannot say, with the necessary certainty to warrant setting aside the entire verdict, that Westbrook's prejudicial argument infected the liability determination as well as that on damages. The unit of time argument—probably the most influential factor in the size of this award—has no bearing on the liability question. We cannot say with the necessary assurance that the community conscience statements, while harmful and permitted in error, could have weighed so heavily as to displace the evidence in the jury's assessment of the presence of a manufacturing defect attributable to General Tire. The issues relating to liability are clearly separable from those establishing damages, and the verdict as to liability was not shown to be the result of error. Therefore, we remand for a new trial as to damages only.

## IV. *Conclusion*

This jury was subjected to two improper appeals during Westbrook's closing argument. These arguments admitted in error

and uncorrected in the charge or in any other manner, prejudiced the deliberations of the jury and affected the substantial rights of the parties. In light of these effects, we conclude that the interests of justice are served by vacating the portion of the final judgment awarding damages to Charles and Kathy Westbrook and by remanding for a new trial as to damages only.

**AFFIRMED IN PART and IN PART VACATED and REMANDED.**