Brenda WILLETT, wife of/and
Donald W. Willett

v.

WESTERN OCEANIC, INC., et al.

Civ. A. No. 85–5062.

United States District Court,
E.D. Louisiana.

Oct. 20, 1987.

Robert C. Stern & Perrin Butler, T.A., John P. Campbell, III, Metairie, La., for plaintiffs.

W.K. Christovich, T.A. and E. Phelps Gay, New Orleans, La., for defendants.

BEER, District Judge.

Replete with numerous symptoms of the inappropriateness of certain aspects of the "Jones Act" remedy, this case exemplifies the ongoing dilemma facing district judges in dealing with the aftermath of these lopsided trials.

Some background and history that may not be clear from the record itself is necessary for an altogether full and fair consideration of the pending motions to grant a new trial or remit the amount of the judgment now before the court.

Both prior to trial and, again, on several occasions, during the trial I suggested that this matter certainly appeared to be a quantum case; that the attorneys should stipulate to that effect and agree to eliminate both plaintiffs' non-meritorious claim for punitive damages and defendants' equally non-meritorious contention of contributory negligence on the part of Donald Willett.

In spite of several lengthly and explicit discussions, the defendants (through counsel) were adamant in pressing their contributory negligence contentions. Indeed, a substantial part of defense counsel's closing argument dramatically addressed this totally failed contention. Defendants' decision to pursue the contributory negligence defense required the plaintiff to address the facts of the accident in complete detail which clearly impressed the jury with the defendants' obvious negligence (essentially admitted even by some of the defendants' own employees).

Additionally, plaintiff and his attractive now pregnant wife were stunningly good witnesses in their own behalf—particularly when describing—in the most exquisite and meticulous detail—the every step of plaintiff's hospitalization, home care, set backs, slow recovery, etc., etc., etc.

To add to my present dilemma, there were some jury "matters" that, on reflection, are upsetting.

The implication portrayed in defendant's memorandum that improper events took place insofar as the jury itself is concerned has caused me considerable worry. Some of the matters mentioned in defendants' memo were dealt with at the time they were first brought to my attention. I sought to deal with them in an appropriate way as the record will confirm. Even so, the details as are now set out in affidavit form were never, prior to the conclusion of the trial, brought to my attention. Even though this is the case, I remain concerned about that aspect of the defendants' contentions in view of the extremely large amount of the award.

Indeed, it is the totality or combination of various circumstances that come together in such a way that I feel compelled to comment about them in some detail:

From the opening of the trial through closing arguments, one juror's husband was present in the courtroom. This juror, Mrs. Zelasko, became the jury foreman.

Secondly, the sister of another juror, Ms. Francois, was also seated in the courtroom during various stages of the trial.

The fact that these "observers" were in the courtroom during the trial does not cause me to conclude that the jury's focus was diverted. However, no one can really be sure of what discussions took place between Mrs. Zelasko and her husband or Ms. Francois and her sister at various stages of the trial notwithstanding my strict admonitions to the jury about their responsibility to discuss the case only among themselves when they retired to reach a verdict. There is something basically unsettling about having a juror's husband, sister, etc. sit through the trial in the courtroom. Yet, the courts are available for all observers regardless of their relationship to the litigants, attorneys, or jurors. I did, however, on my own motion, excuse these observers when matters were addressed that required the jury to leave the courtroom.

What was clear to me fairly early in the trial—and became clearer and clearer as the case went on—was that the jury was in strong and total disagreement with the contributory negligence contentions of the defendants and was, I think, "put off" by them. Conversely, they paid almost rapt attention to the intricate details of plaintiff's painful and frustrating recovery from his serious and jarring injuries—especially the descriptions of the tender and essential care brought to him by his wife of only one week. It was a full presentation with no stone left unturned yet, also, candid in my opinion.

While it is apparent that plaintiff's injuries were painful and, to some degree, disabling over the long term there are, all around us, examples, by the thousands, of the triumph of the human spirit over far more compelling physical problems than healed broken wrists and a healed cervical fracture. The play by play description of plaintiff's daily struggle with his injuries (and that of his loyal and faithful young wife) provoked an astounding response from this jury. This response is the natural brainchild of that so-called line of cases that has placed almost every Jones Act jury into the bedroom, bathroom and bed itself of the plaintiff and the plaintiff's spouse.

Almost as compelling in the establishment of absurd unwieldy contradictions (only slightly less ludicrous than the above) is the so-called expert economic testimony that translates an injured plaintiff's annual income to that of an Arabian oil potentate by 2025 or thereabouts. This jury was, I believe, unknowingly influenced by these figures just as they were, I believe, enormously frustrated about the instruction that "Brenda's claim" could not be acknowledged with an award if they did not find the "vessel" to be "unseaworthy."

At the core of these obvious frustrations is the line of cases that give us little or no meaningful guidance in the actual handling of these fiscally explosive matters. We are instructed to encourage settlement but not to badger. We are told to be active in the consideration of qualification of experts and to watch carefully over their testimony while at the same time we are given guidelines like "Culver I" and "Culver II" to measure it with. So we find ourselves actually endorsing some of the most appalling fictions by imposing "guidelines" on the pure speculation of these self-styled economic experts. Then, with only an admonition to the jury not to be affected by sympathy or prejudice for the plaintiffs, we step into their bedroom for hours of testimony about how his young and dedicated new wife has to manage his every action, etc., etc., etc. All perfectly admissable, just be sure to tell the jury its not to predicate any award on sympathy.

The dilemma becomes even greater. Consider the following:

Did the defendants manifestly fail to take advantage of proffered settlement arrangements that appeared to be reasonable in the circumstances?

Answer: Yes.

Did the defendants refuse to deal realistically with the court's suggestions regarding their contributory negligence defense?

Answer: Yes.

Did the plaintiffs or their counsel act improperly in the conduct of the trial or in the pretrial negotiations?

Answer: No.

Was there any outside influence on the jury?

Answer: Possibly. My best guess is that the courtroom sitters may have improvidently influenced the jury.

Was the jury conscientious in going about its work?

Answer: Probably, with the exception noted above.

Was the jury influenced by sympathy and, indeed, also put off by the contentions of contributory negligence in the fact of the clear and unrefuted testimony demonstrating defendants' negligence?

Answer: *Very* likely.

Was the jury overly impressed by plaintiffs' economic expert's calculations, particularly in light of their dilemma about "Brenda's claim?"

Answer: Very, very likely.

Was there anything manifestly improper, under the law of the Circuit, about such testimony?

Answer: No.

Did the jury increase the size of the award to take into account "Brenda's" claim notwithstanding their finding regarding seaworthiness?

Answer: Almost surely.

Was the award sufficiently on the high side so as to shock my judicial conscience?

Answer: Absolutely.

How does a district judge address these matters in an even handed way when he perceives the defendants mismanaged the presentation of their case, but still the award shocks the judicial conscience under the circumstances of the case. My conclusion is that the judge has to do his duty vis-a-vis the inappropriateness of the quantum award, all other factors to the contrary notwithstanding.

But even here there are no absolutely clear lines of demarkation.

The law addressing the propriety of the trial court granting a new trial or putting the plaintiff to terms to accept a remittitur is voluminous. Yet, the jurisprudence of this Circuit reveals a few common threads to guide me in my decision.

■ Generally, the trial court can order a new trial, ask the parties to submit to a remittitur, or simply order a new trial only on the issue of damages. *Keeler v. Richards Manufacturing,* 817 F.2d 1197, 1202 (5th Cir.1987); *Caldarera v. Eastern Airlines,* 705 F.2d 778, 784 (5th Cir.1985). The standard a judge must follow when attempting to decide whether to upset a jury verdict is clear. A jury award is not set aside or a new trial awarded unless the award is so exorbitant as to shock the conscious or indicate bias, passion, prejudice or other improper motive on the part of the jury. *Coburn v. Browning Arms Co.,* 565 F.Supp. 742, 750 (W.D.La.1983).

A new trial is generally ordered upon a finding by the District Court that the jury verdict was a result of bias, prejudice, or passion. *Wells v. Dallas Independent School District,* 793 F.2d 679 (5th Cir. 1986). *Westbrook v. General Tire and Rubber Co.,* 754 F.2d 1233, 1241 (5th Cir. 1985). The *Westbrook* court pointed out, however, that where a jury verdict is grounded in bias, prejudice or passion, a remittitur is sometimes used, though the preferred approach may be to require a new trial. 754 F.2d at 1241. See, *Gorsalitz v. Olin Mathieson Chemical Corp.,* 429 F.2d 1033 (5th Cir.1970) (the court allowed a remittitur to stand where the evidence showed that the jury verdict was the product of sympathy and not detached reason); *Edwards v. Sears, Roebuck and Co.,* 512 F.2d 276 (5th Cir.1975). In *Edwards,* this circuit again allowed a remittitur to stand. *Id.* at 282. The court reasoned that

"*Butts* and *Gorsalitz* demonstrate that even if the jury's verdict in its entirety was affected by undesirable factors, if the fact of liability is nonetheless fairly demonstrable, and the district court has not concluded that a new trial is necessary, it will not be blindly assumed that the liability issue was wrongly decid-

ed. A jury's finding as to liability can be binding even though its monetary award is found to be excessive or even improperly influenced—our deference to faith in the jury system demands at least this much."

*Id.*

 I conclude from this thought that although the jury verdict was hedged about with extensive sympathy, it is nevertheless subject to remittitur since liability was firmly and correctly established, as was the finding of no contributory negligence.

 When a remittitur is allowed, the verdict can be reduced only to the maximum amount the jury could have awarded. *Lowe v. General Motors Corp.*, 624 F.2d 1373, 1383 (5th Cir.1980). In fact, the general trend in this Circuit has been to remit jury awards which are "grossly excessive" provided liability is clearly established. *Id.* See also, *Keyes v. Lauga*, 635 F.2d 330, 336 (5th Cir.1981); *Bonura v. Sea Land Service, Inc.*, 505 F.2d 665 (5th Cir.1974). The "maximum recovery rule" entails a calculation of whether the amount which remains after the remittitur reflects the maximum amount the evidence supports. *Coburn v. Browning Arms Co.*, 565 F.Supp. 742, 751 (W.D.La.1983).

 The "maximum recovery rule" stands as a procedural buffer between the trial court and the sanctity of the jury verdict. Essentially, the rule exists to prevent a determination by the court as to what *it* considers a fair award. *Jackson v. Magnolia Brokerage Co.*, 742 F.2d 1305, 1307 (11th Cir.1984). (The *Jackson* court relied on Fifth Circuit law in reaching its conclusions regarding the propriety of a remittitur and the reach of the maximum recovery rule.) The amount by which a jury verdict may be remitted is restricted to prevent a judge from substituting his opinion for that of the jury. See, *Delesdernier v. Porteric*, 666 F.2d 116 (5th Cir. 1982), *Geyer v. Vargas Products, Inc.*, 627 F.2d 732 (5th Cir.1980), *Bonura v. Sea Land Service, Inc.*, 505 F.2d 665, 670 (5th Cir.1974), *Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033 (5th Cir. 1970).

Even so, the District Court is still required to operate under the basic notion usually described as "shocking to the judicial conscious". *Mouton v. Tug "Ironworker"*, 811 F.2d 946 (5th Cir.1987); *Zeno v. Great Atlantic & Pacific Tea Co.*, 803 F.2d 178, 187 (5th Cir.1986); *Caldarera v. Eastern Airlines*, 705 F.2d 778, 784 (5th Cir.1983); *Allen v. Seacoast Products, Inc.*, 623 F.2d 355, 364 (5th Cir.1980).

 Pushed and pulled by these admonitions, cautions, restraints, and obligations, I have concluded that I should order a remittitur in the amount of $600,000.00 thereby reducing the jury verdict to $900,-000.00.

Accordingly, the court hereby conditions its denial of Western Oceanic's Motion for New Trial on plaintiff, Donald Willett's acceptance of a judgment remitted by $600,-000.00 to $900,000.00. Plaintiff Donald W. Willett has fourteen (14) days from the entry of this order to accept this remitted judgment by furnishing a judgment consistent with this order. If by the expiration of that time period plaintiff has not accepted the remitted judgment, defendant's Motion for New Trial will be deemed granted. Such trial will be on the issue of damages only, and will be limited solely to the amount of damages to be awarded to Donald Willett for injuries caused by the defendant's negligence under the Jones Act.