United States Court of Appeals,

Fifth Circuit.

No. 93-7706.

Tony C. EILAND and Darlene Eiland, Plaintiffs-Appellees-Cross-Appellants,

v.

WESTINGHOUSE ELECTRIC CORPORATION, Defendant-Appellant-Cross-Appellee.

July 14, 1995.

Appeals from the United States District Court for the Northern District of Mississippi.

Before REAVLEY, DUHÉ, and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

This product liability action is before us on cross appeals attacking the jury's verdict for Plaintiffs on liability and compensatory damages, as well as the trial court's directed verdict for defendants on Plaintiffs' claims for failure to warn and punitive damages. We affirm the verdict on liability issues, and vacate the damage award, allowing Plaintiffs to accept either remittitur or a new trial on damages.

FACTS

On May 19, 1989, Plaintiff-Appellant, Tony Eiland (Eiland) was injured when an explosion occurred in a high power circuit breaker. Eiland was employed as a lineman for Starkville Electric Department (Starkville Electric), a distributor of electricity in Starkville, Mississippi. Starkville Electric operated a substation which utilized high power circuit breakers, including the one at issue (Breaker 334), a 144GC500 oil circuit breaker manufactured and sold

by Defendant-Appellee Westinghouse Corporation (Westinghouse) in 1960 to Tennessee Valley Authority (TVA). It was installed at the Starkville substation which was operated by TVA until Starkville Electric began operating it in 1983.

During a storm in the early morning of May 19, 1989, a power outage occurred and Eiland was dispatched to the substation. He noticed that Breaker 334 was open, and he closed it manually. When requested by another employee to re-open the breaker, he did so. An explosion followed immediately, severely burning Eiland's hands, arms, face, and torso.

Oil circuit breakers are designed to protect other electrical equipment in a distribution system by interrupting the electrical current if a short circuit or other fault occurs in the system. There are three pair of contacts in a large tank filled with oil, each including a stationary contact and a moving contact. The oil serves as an insulator to help extinguish arcs that occur inside the breaker when it trips. When the contacts are closed, electricity is carried through the internal parts. When a breaker operates to interrupt electric current, the contacts open or separate. Each pair of contacts operates within a boxlike structure known as an interrupter grid which is designed to extinguish the arc which naturally occurs when the contacts separate.

At trial, Eiland contended that the arc escaped the interrupter grid, traveled through the oil to the side of the metal tank (phase-to-ground arcing), puncturing a small whole in the tank

2

and causing the explosion. Breaker 334 was not equipped with an insulating tank liner, which would have prevented phase-to-ground arcing. Defendants' theory of the case was that due to lack of proper maintenance corrosion accumulated on the contacts, causing arcing between the contacts (phase-to-phase arcing) which resulted in an explosion. Defendants concede that there was simultaneous phase-to-ground arcing, but contend that it was not the cause of the explosion.

Eiland required five weeks of in-patient hospital care and several additional weeks of out-patient care, which included painful debridement procedures and various surgeries. He returned to work part time after eight months, and full time after 21 months. He developed extensive keloid scarring, and remains approximately 30% to 40% disabled and badly disfigured. Because he was unable to return to his job as a lineman, Starkville Electric gave him a job as warehouse foreman, with a slight reduction in pay and a ten year freeze on his salary.

Eiland's lost earnings prior to trial were $30,081.00 and past medical expenses were $172,744.00.

PROCEEDINGS BELOW

Eiland and his wife Darlene Eiland filed their product liability action on April 28, 1992 in Mississippi state court, asserting two theories of liability: strict liability and post-sale negligent failure to warn. Westinghouse removed the case to federal court on the basis of diversity. The district court, applying Mississippi substantive law, granted a directed verdict

3

for Westinghouse on Eiland's post-sale negligent failure to warn claim and the claim for punitive damages. The liability questions presented to the jury were (1) whether the circuit breaker was defective and unreasonably dangerous when it left Westinghouse's hands because its design did not include an insulating tank liner; (2) whether Eiland was injured while Breaker 334 was being used in a manner and for the purpose for which the product was intended; and (3) whether the alleged defective condition of the product was the sole cause or contributing cause of Eiland's injury. After a six day trial, the jury found Westinghouse liable on the defective design claim, and awarded Eiland $5,000,000 and Darlene Eiland $-0-.

LIABILITY

a. Eiland's expert

Bill Adams, (Adams) a licensed electrical engineer, was offered by Eiland as an expert witness to reconstruct the accident. Eiland did not offer him as an expert in maintenance or design. Westinghouse objected, and the trial court ruled that Adams was qualified to state an opinion on how the accident happened. Westinghouse contends that Adams was not qualified to testify as an expert. Further, they contend that he gave opinions concerning design, an area that was outside his area of expertise.

Expert opinion testimony is admissible if it is helpful to the jury in understanding the evidence or determining a fact in issue. FED.R.EVID. 702. The admission or exclusion of expert testimony is a matter left to the discretion of the trial court, and that decision will not be disturbed on appeal unless it is

4

manifestly erroneous. *Smogor v. Enke,* 874 F.2d 295, 297 (5th Cir.1989). *See also Phillips Oil Co. v. OKC Corp.,* 812 F.2d 265, 280 n. 32 (5th Cir.1987) (explaining that the "manifest error" standard is harmonious with the "abuse of discretion" standard as applied to this issue in other Fifth Circuit cases).

Adams began his testimony by explaining how Breaker 334 worked. Adams then testified that after studying Breaker 334 and the materials related to it, he formed an opinion that indentations or craters on the side of the tank wall were caused by arcing over many years. He also testified that arcing to the tank wall caused a hole in the tank which resulted in the explosion that injured Eiland, and the presence of a tank liner would have prevented arcs from reaching the tank wall.

The opinions stated by Adams were based on observations of the tank wall and the internal equipment of the breaker, and are within the expertise of an engineer with Adams's experience. Westinghouse's objections, in effect, attacked Adams's credibility. After reviewing the record, we have concluded that Adams was qualified to give opinions in the areas covered in his testimony, and that the opinions were helpful to the jury in understanding the evidence and determining a fact in issue. Further, a reasonable jury could have credited Adams's testimony. Therefore, there is no merit in Westinghouse's contention that the trial court abused its discretion in admitting Adams's testimony.

b. Post-sale evidence

Westinghouse contends that the district court abused its

5

discretion in admitting evidence of post-sale incidents involving similar breakers and post-sale design changes.  Their position is bottomed on the assertion that the evidence was not admissible because it was not relevant under Federal Rule of Evidence 401, and if relevant, its probative value was outweighed by the danger of unfair prejudice, and therefore inadmissible under Federal Rule of Evidence 403.  Because of his or her involvement in the trial, a district court judge often has superior knowledge and understanding of the probative value of evidence.  Therefore, we show considerable deference to the district court's evidentiary rulings, reviewing them only for abuse of discretion. *Johnson v. Ford Motor Co.,* 988 F.2d 573, 578 (5th Cir.1993).

Evidence showed that at least ten other 144GC breakers failed or exploded prior to the accident that injured Eiland.  In 1966 a corrective baffle was installed in Breaker 334, as well as most other 144GC breakers, to prevent "improper arcing."  Westinghouse characterized the addition of the baffle as a post-sale design change to correct an unrelated problem, and moved to keep it out of evidence.  Eiland contends that Westinghouse made the addition of the baffle relevant by arguing that the breaker's arcing problem was caused by poor maintenance.  There were two marks on the breaker that resulted from arcing before the baffle was added in 1966.  The trial court admitted Eiland's evidence which tended to show that there had been an arcing problem while TVA had the breaker, and that the arcing problem was therefore not caused by poor maintenance as Westinghouse argued.

Next, the district court admitted evidence that other 144GC breakers had failed. Eiland had to show that the incidents of failure or explosions were substantially similar to the accident here in order to establish admissibility under FED.R.EVID. 403, which requires the trial court to balance probative value against danger of unfair prejudice. *Johnson v. Ford Motor Co.,* 988 F.2d 573, 579 (5th Cir.1993). After hearing the evidence about other failed breakers, the trial court ruled that the incidents were not similar enough to the case on trial to establish post sale negligence.

The district court initially admitted evidence of the "Puget Sound Study" in which Westinghouse conducted tests to determine whether tank liners were required in the 144GC breakers after one such breaker failed. The study concluded that tank liners prevented arcing to the tank wall. Westinghouse contends that the study is irrelevant because the breakers were being used in a dissimilar application: testing fuses instead of protecting against short circuits. Eiland contends that evidence of the study was relevant to refute Westinghouse's contention that in developing the breakers during the 1960's and 1970's *all* testing was done without a tank liner and to prove that phase-to-ground arcing occurred in a well maintained breaker, albeit in a different application. The study itself was excluded, but the district court allowed Eiland to question experts about aspects of the study. Later in the trial, the district court ruled that evidence of the study was not admissible, and it was excluded.

7

Finally, evidence was admitted concerning the addition of tank liners to 144GC breaker design.  Westinghouse changed the design of these breakers by adding tank liners in May of 1960.  However, the new breakers containing liners were not marketed until early 1961.  The breaker involved in this case was placed in the stream of commerce in October of 1960, after the design change.

This case involved complex scientific evidence.  The evidence concerning the addition of baffles, the causes for other failed breakers, and the effect of tank-liners was relevant to the question of both the results of the phase-to-ground arcing phenomenon inside 144GC breakers and whether that phenomenon was a cause, in fact, of the explosion in this case.  Equally relevant was Westinghouse testimony attributing the cause to poor maintenance and corroded contacts.  The district court did not abuse its discretion in admitting the evidence either under Rule 401 or Rule 403.

c. Defect and Causation

Westinghouse contends that there was not sufficient evidence that a design defect caused Eiland's injury to warrant submitting the case to the jury.  Eiland introduced competent evidence that, if believed, would support the liability finding against Westinghouse:  phase-to-ground arcing caused the explosion, and an insulating tank liner would have prevented such arcing.  Under Mississippi law, the jury had to find that the defect, lack of a tank liner, was a contributing cause of the injury. *Ford Motor Co. v. Matthews,* 291 So.2d 169, 176 (Miss.1974) (citing RESTATEMENT

8

(SECOND) OF TORTS § 402A (1965)). There was ample evidence to support the jury's liability determination.

In the alternative, Westinghouse argues that to the extent that Eiland's proof of defect had any probative value, it was substantially outweighed by proof that there was no defect. Westinghouse relies on the assertion that their experts were better qualified than Eiland's expert, and their theory of the case more plausible. However, the jury could have decided that any or all of Westinghouse's evidence lacked credibility, including the expert testimony. This argument has no merit.

DAMAGES

a. Future Medical Damages

Westinghouse contends that there was no competent evidence to support an award of future medical damages. Under Mississippi law, the general rule is that where it is established that future consequences from an injury to a person will ensue, recovery therefor may be had, but such future consequences must be established in terms of reasonable probabilities. *Flight Line, Inc. v. Tanksley,* 608 So.2d 1149 (Miss.1992); *Entex, Inc. v. Rasberry,* 355 So.2d 1102, 1104 (Miss.1978). Eiland has developed extensive keloid scarring over the burned portions of his body. He had surgery to relieve contractures in his wrist, fingers and thumbs prior to trial, and will, in all reasonable probability, require additional surgical relief from contractures as the scars age. Dr. Love, Eiland's treating physician, testified that a procedure known as skin culturing was available to correct some of

the keloid scarring, but there were some drawbacks in Eiland's case that would have to be considered.

The estimates for future medical expenses relating to skin culturing ranged from $100,000—$500,000, depending on a number of factors, including the extent to which Eiland subjects himself to the procedure, its success and the problems encountered in its application to Eiland. The evidence also included information about more traditional surgery that Eiland faces in the future. Such estimates of future medical expenses, if accompanied by the range of variables applicable in a given case, permit the jury to evaluate future medical needs and to make findings based on reasonable probability in accordance with the jury instructions. The evidence established the reasonable probability that Eiland will require future surgical treatment, and created a fact question, properly circumscribed by specifics, concerning the dollar amount of future medical expenses appropriate for resolution by the jury.

b. Future Lost Earnings

Eiland offered evidence of future lost earning capacity, but neither Eiland or Westinghouse offered evidence of work life expectancy or of a discount rate. At the charge conference, the parties and court discussed how to instruct the jury on reducing future lost earnings to present value. Eiland submitted, but withdrew, a request for instructions requiring the jury to reduce any award of future damage to present value. Westinghouse took the position that it was Eiland's burden to put on proof to support

reduction to present value, and it is not the defendant's burden to fill in the holes in a plaintiff's case.  However, Westinghouse did not object to the fact that the charge did not include an instruction on reducing future lost earnings to present value. They argue on appeal that because Eiland failed to present evidence to support an instruction on reduction to present value, it was error to allow future lost earnings to go to the jury at all. Eiland responds that Westinghouse's failure to put on evidence or request a jury instruction on the issue is fatal to their claim here.

Under Mississippi law, an instruction on present value reduction of lost earnings is proper on request of the defendant if there is evidence to support it, but is waived without proper request.  *Young v. Robinson,* 538 So.2d 781 (Miss.1989). Westinghouse asks us to hold that failure to request the instruction in this case did not amount to waiver because Westinghouse was of the opinion that there was no evidence to guide the jury in deciding the appropriate amount of reduction.  There is no Mississippi case that supports that position.

There was sufficient evidence for the jury to accurately calculate future work life expectancy and future lost wages. Westinghouse waived any error in the damage instructions by failing to object to the instructions or request a specific instruction on reduction of future damages to present value.

c. Remittitur

Of the $5 million in compensatory damages awarded to Eiland,

11

approximately $3.6 is noneconomic loss, including pain and suffering, disfigurement, and impairment not accounted for in lost wages. Westinghouse made a post-trial motion for new trial or for remittitur, which the district court denied.

Mississippi law provides that a court may grant a remittitur if it finds that the damages are excessive "for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence. If such ... remittitur be not accepted then the court may direct a new trial on damages only." MISS.CODE ANN. § 11-1-55 (1972). Likewise, this circuit's case law provides for remittitur if the award is excessive, and new trial on damages alone if the plaintiff declines the remitted award. *Westbrook v. General Tire and Rubber Co.,* 754 F.2d 1233, 1242 (5th Cir.1985); *Caldarera v. Eastern Airlines, Inc.,* 705 F.2d 778, 786 (5th Cir.1983).

There is a strong presumption in favor of affirming a jury award of damages. The damage award may be overturned only upon a clear showing of excessiveness or upon a showing that the jury was influenced by passion or prejudice. *Westbrook v. General Tire and Rubber Co.,* 754 F.2d 1233, 1241 (5th Cir.1985). The decision to grant or deny a motion for new trial or remittitur rests in the sound discretion of the trial judge; that exercise of discretion can be set aside only upon a clear showing of abuse. *Id.* However, when this court is left with the perception that the verdict is clearly excessive, deference must be abandoned.

12

A verdict is excessive if it is "contrary to right reason" or "entirely disproportionate to the injury sustained." *Caldarera v. Eastern Airlines, Inc.,* 705 F.2d 778, 784 (5th Cir.1983). While pain and suffering is not easily susceptible to monetary quantification, and the jury has broad leeway, "the sky is simply not the limit for jury verdicts, even those that have been once reviewed." *Simeon v. T. Smith & Son, Inc.,* 852 F.2d 1421, 1427 (5th Cir.1988). Eiland no doubt experienced intense pain during his initial treatment, and was left with a lifetime of disfigurement and some degree of disability. However, he was able to return to work part time within a few months, and full time by the end of two years. After a review of the record, we have concluded that the $5 million verdict was excessive and the district court abused its discretion in denying Westinghouse's motion for remittitur.

Our power to grant a remittitur is the same as the district court's. We determine the size of the remittitur in accordance with this circuit's "maximum recovery rule" by reducing the verdict to the maximum amount the jury could properly have awarded. *Dixon v. International Harvester Co.,* 754 F.2d 573, 590 (5th Cir.1985). Of course, our reassessment of damages cannot be supported entirely by rational analysis, but involves an inherently subjective component. *Id.* In our view, $3 million is the maximum the jury could properly have awarded in this case.

## CROSS APPEAL

The Eilands cross-appealed, contending that in the event

Westinghouse should be granted a new trial on any issue, the new trial should include evidence excluded in the first trial, and reconsideration of Darlene's Eiland's claim for damages. Because of our disposition of the remainder of this appeal, it is unnecessary to address the Eilands' claims. If Eiland chooses not to accept the remittitur, and elects a new trial, that trial will be limited to the question of the appropriate amount of Eiland's compensatory damages. Darlene Eiland has not raised any issue that would merit disturbing the jury's verdict of awarding $-0- damages on her claim.

## CONCLUSION

The verdict of the jury and the judgment of the district court on the issue of liability is AFFIRMED. We VACATE the jury's damage award of $5 million. We offer Eiland a remittitur of the jury award to $3 million or a new trial on compensatory damages alone.